IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAM VANDEURSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-CV-2416 |
| | ) | |
| CAMBRIA ENTERPRISES, INC., a Minnesota | ) | |
| corporation, and CAMBRIA FABSHOP- | ) | Judge Darrah |
| CHICAGO, INC., a Minnesota corporation, | ) | Magistrate Judge Keys |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants, Cambria Enterprises, Inc. and Cambria FabShop – Chicago, Inc.

(collectively "Cambria"), pursuant to Federal Rules of Civil Procedure 12(b)(3) and (b)(6),

submits this memorandum of law in support of its motion to dismiss.

## INTRODUCTION

This motion presents a simple question — whether Plaintiff, Pam VanDeursen

(hereinafter "Plaintiff or "VanDeursen") can ignore a forum selection clause in a Confidentiality

and Noncompete Agreement by seeking to have an Illinois state court invalidate that Agreement,

when Plaintiff consented to have any dispute relating to that Agreement resolved in a Minnesota

court. Plaintiff clearly cannot circumvent the parties' choice of forum. Plaintiff's request for

relief relating to the Confidentiality and Noncompete Agreement should be dismissed for

improper venue under Rule 12(b)(3).

Additionally, Cambria is entitled to do business with whomever it chooses. Yet, plaintiff

seeks relief to compel Cambria to reinstate its at will relationship with her new employer,

Surface Solutions, Inc. ("Surface Solutions"). As a result, Plaintiff has no standing to seek such

relief. Indeed, plaintiff is not a real party in interest with respect to the alleged "business partnership agreement" between Surface Solutions and the Cambria Defendants. Plaintiff's claims for relief under the alleged "business partnership agreement" must be dismissed under Rules 12(b)(6) and 17(a) for failure to state a claim upon which relief can be granted.

## BACKGROUND FACTS

Cambria is a manufacturer and distributor of natural quartz surfaces for kitchens, bathrooms, fireplace surrounds, and other applications, which are sold under the CAMBRIA brand. (*See* Affidavit of Susan Gliszinski ("Gliszinski Aff."), attached hereto as Exhibit 1, at ¶ 2).

A.     CAMBRIA Installer Network

Cambria distributes its products through a network of independent installers, each called a CAMBRIA Installer Associate (or "CIA"). A CIA purchases product from Cambria and sells it to end users. (*Id.* at ¶ 3). To become a CIA, the installer's representatives must attend an orientation and informational session in LeSueur, Minnesota called "Cambria University," where they are instructed on various subjects related to the installation of CAMBRIA products. (*Id.*). CIA's are not required to make any material investment in equipment or facilities to become a CIA. (*Id.*) CIA's are not required to sell CAMBRIA products exclusively. (*Id.*) To the contrary, most CIA's carry multiple product lines. (*Id.*).

When a supplier becomes an approved CIA, the installer is issued a single, controlled copy of the CAMBRIA FabShop System Business Operating Requirements Manual (the "BORM"). (*Id.* at ¶ 4). The BORM is a confidential document which contains detailed instructions relating to AutoCad Drawing, Field Installation, and Finish Work for CAMBRIA products. (*Id.*). It does not create any contractual business relationship between the parties, nor does the BORM address any such business relationship. (*Id.*). In essence, the BORM is an

2

installation guide, nothing more and nothing less.  If a CIA is "decertified" by Cambria, the supplier must return the BORM to Cambria.  (*Id.*).

Neither Cambria nor any of its affiliates enter into any form of supplier or distributorship agreement with CIAs.  (*Id.* at ¶ 5).  The only documentation provided to the supplier is the BORM, and any updates to the BORM.  (*Id.*).  The relationship between Cambria and CIAs is that of supplier/fabricator and installer, and the relationship is terminable at the will of either party without notice.  (*Id.*).

> B.    Plaintiff's Employment As A Cambria Market Representative

On December 7, 2005, Cambria offered VanDeursen a position as a Market Representative.  (*Id.* at ¶ 6 & Ex. A).  That offer was made "contingent upon you signing the Confidentiality and Non-Compete Agreement that will be sent to you, [which] needs to be executed and returned to me by your first day of work."  (*Id.*).  The Agreement was sent to plaintiff, and she signed it effective January 1, 2006.  (*See* Plaintiff's Complaint at Ex. A; Gliszinski Aff. at ¶ 8 & Ex. B (better copy)).

Plaintiff worked for Cambria as one of three Market Representatives in Chicagoland.  (*See* Affidavit of Pat Simonett ("Simonett Aff."), attached hereto as Exhibit 2, at ¶ 2).  It was plaintiff's duty to recruit potential CIAs for Cambria in her territory.  (*Id.*).  Additionally, plaintiff was responsible for stimulating demand for CAMBRIA products within her territory, by doing things such as attending trade shows and conferences and visiting CIA retail locations, developers, architects, builders, and contractors.  (*Id.*).

As part of her duties as a Market Representative, plaintiff was very familiar with Cambria's business plans and strategies, supplier/installer base and performance, customer base, and customer preferences in Chicago and most of Northern Illinois.  (*Id.* at ¶ 3).  She actively participated in management meetings where that information was shared and discussed, and she

played an active part in developing Cambria's sales and marketing strategies. (*Id.*). This information is subject to reasonable secrecy measures, such as the Confidentiality and Noncompete Agreement that Plaintiff executed before going to work for Cambria. (*Id.*).

    C.    <u>Plaintiff Fails To Develop Surface Solutions, Inc. As CIA</u>

    Surface Solutions was one of seven CIAs within Chicagoland. (*Id.* at ¶4). VanDeursen was responsible for generating enthusiasm and promotion of Cambria products at Surface Solutions. (*Id.*). Plaintiff was not effective in doing so. (*Id.*). In 2007, Surface Solutions sold less than $60,000 in Cambria products. (*Id.*). By the first quarter of 2008, Surface Solutions was selling only about one kitchen per month, or its equivalent ($4,000), in Cambria products, making Surface Solutions one of the poorest performing CIAs in the entire Great Lakes 2 District - - if not the worst performer. (*Id.*).

    Surface Solutions represented 15 or more surface products in addition to Cambria products — including natural quarts surfaces from Zodiaq, Silestone, Caesar Stone, and Technistone, which compete directly with CAMBRIA products. (*See* Simonett Aff. at ¶ 5 & Ex. A. Cambria is the industry leader in natural quartz surfaces. (*Id.* at ¶ 6). It was apparent to Cambria that Surface Solutions was using its position as a Cambria installer to engage in a practice known as "flipping," using the prominence of the Cambria brand and image to draw customers into its locations, then diverting customers to competitors' products, on which Surface Solutions presumably had better margins or terms. (*Id.*). This reflected poorly on Pam VanDeursen because it was her principal responsibility to increase sales of Cambria products with her CIA's, and to prevent stagnant or declining sales of Cambria within her territory. (*Id.*).

    D.    <u>Pat Simonett Places Plaintiff On A Performance Improvement Plan</u>

    Plaintiff's direct supervisor, Pat Simonett, discussed with plaintiff, several times in 2007 and in early 2008, the poor performance of Surface Solutions and how plaintiff's performance as

a Market Representative was under scrutiny, in part, as a result of the poor sales performance of Surface Solutions as a CIA.  (*Id*. at ¶ 7).  Plaintiff clearly recognized that Surface Solutions was not performing at a satisfactory level.(*Id*.).  In her last two call reports dated January 31 and February 8, 2008, respectively, plaintiff rated Surface Solutions' "Call Status" as "Struggling with Cambria integration."  (*Id.*).

At a management meeting on February 20, 2008, plaintiff was part of a serious discussion about the poor sales performance of Surface Solutions.  (*Id*.).  The group concluded that, at best, Surface Solutions was a marginal performer, and all agreed that the relationship with Surface Solutions should be terminated.  (*Id*.).  VanDeursen herself agreed - - at that meeting on February 20, 2008 - - that Surface Solutions be "decertified."  (*Id*.).

On February 29, 2008, Simonett, placed plaintiff on 30-day performance plan.  (*Id*. at ¶ 8).  Her superiors viewed plaintiff as not exhibiting either the quantity or quality of sales activities they expected.  (*Id*.).  On March 11, 2008, about midway through her performance plan review period, plaintiff contacted Simonett and told him that she agreed that she was not performing her job adequately and that she intended to resign from her employment with Cambria.  (*Id*. at ¶ 9).  On March 14, 2008, at plaintiff's request, Simonett met VanDeursen at a gas station nearby her home so he could drop off personal items she had left in the office.  (*Id*.).  She told Simonett then that she may have an "opportunity" at Surface Solutions, but she did not elaborate further, and was also considering another "opportunity" out West.  (*Id.*).

E.     Cambria Terminates Its Relationship With Surface Solutions

On April 4, 2008, Simonett visited Surface Solutions' offices in St. Charles, Illinois and personally informed the owners of Surface Solutions, Gary Linze and Troy Ellsoos, that Cambria was "decertifying" Surface Solutions as a CIA.  (*Id*. at ¶ 10).  Simonett also asked Linze and Ellsoos about a rumor he had heard about VanDeursen possibly going to work for them.  (*Id.*).

5

Linze confirmed plaintiff's hiring by Surface Solutions. (*Id.*).  Simonett told Linze and Ellsoos that VanDeursen had a Confidentiality and Noncompete Agreement with Cambria, and asked them if VanDeursen had explained to them that she had a noncompete agreement with Cambria, to which they had no response.  (*Id.*).  At that meeting, Simonett also requested that BORM be returned, and it was.  (*Id.*).

>F.   Cambria Now Faces Irreparable Harm

Cambria was now faced with a potential serious problem.  It had a disgruntled ex-employee, VanDeursen, who was going to work for a disgruntled ex-supplier, Surface Solutions, each of whom was positively incented to deflect sales away from Cambria products toward competitors' products, and one of whom, VanDeursen, was possessed with detailed and intimate knowledge regarding the Defendants' business plans and strategies, customer information, and supplier information which could be used to assist her and Surface Solutions in deflecting sales away from Cambria products.  (Gliszinski Aff. at ¶ 7).

The Agreement precludes VanDeursen from accepting employment with Surface Solutions, i.e., from being "involved in any activities in direct competition with the business of Employer."  As a seller of products competitive with Cambria, Surface Solutions clearly is a prohibited employer.  (*See* Plaintiff's Complaint at Ex. A; Gliszinski Aff. at Ex. B).  Moreover, the Agreement calls for application of Minnesota law and selects a Minnesota district court as the forum for any dispute relating to the Agreement:

>12.   Choice of Law/Forum.  This Agreement shall be construed and determined according to the laws, jurisdiction and venue of the State of Minnesota, and any disputes arising out of this Agreement shall be determined in a Minnesota District Court.

(Complaint, Ex. A at p.4, ¶ 12; Gliszinski Aff. at p. 4, ¶ 12).

G.    Cambria Advises Plaintiff And Surface Solutions Of Plaintiff's Agreement

On April 10, 2008, Sue Gliszinski, a Cambria in-house legal representative, sent letters via certified mail, return receipt requested to both plaintiff and Surface Solutions reminding and informing them, respectively, of plaintiff's obligations under her Confidentiality and Noncompete Agreement, and requesting a response from Surface Solutions by April 20, 2008. (Gliszinski Aff. at ¶ 9 & Exs. C, D).  Gary Linze of Surface Solutions responded to Gliszinski by letter dated April 18, 2008, requesting until April 24, 2008 "to address your accusations."  (*Id.* at Ex. E).  Ms. Gliszinski's assistant contacted Mr. Linze and informed him that the requested extension of time would be acceptable, to which Mr. Linze responded "thank you."  (*Id.* at ¶ 11).

Gliszinski's business courtesy was met with underhanded bravado.  By facsimile transmission shortly after 6:00 p.m. on April 24, 2008, Cambria received Linze's response  - - copies of a Cook County complaint for declaratory and injunctive relief and papers related to a motion for TRO, which apparently had been filed with the Circuit Court of Cook County earlier in the day on April 24, 2008.  (*Id.* at ¶ 10; *see* Notice of Removal (state court complaint attached)).  Clearly, Linze's request for an extension of time was to deceive Gliszinski and to keep her from taking legal action in Minnesota while plaintiff prepared preemptive litigation in Illinois, despite the forum selection provision in VanDeursen's contract.

H.    Disparagement Directed At Cambria

To compound matters, Cambria has learned rumors are being spread to the effect that Cambria is experiencing production delays of up to six weeks.  Such information is patently false, but is extremely harmful to Cambria business.  (*See* Simonett Aff. at ¶ 12).  In the construction and renovation business, builder/remodelers and property owners very often base their product decisions on availability.  (*Id.*).  A delay of more than two to three weeks would

7

likely preclude a builder/remodeler or owner from selecting that product — they will move on to a similar product that is more readily available.  (*Id*.).

Specifically, in one instance, a Cambria retailer was told by Surface Solutions that Cambria was out six weeks.  (*Id*. at ¶ 13).  In another instance, an installer from South Beloit was told by an employee at Surface Solutions that Cambria was out six weeks.  (*Id.*).  In fact, Cambria is not having any production or delivery issues and is running at or shorter than 10 days, not six weeks.  (*Id*.).  This kind of disparagement in the marketplace is potentially extremely damaging to Cambria, and Surface Solutions and/or VanDeursen apparently are the source of it.

Additionally, Cambria has discovered that VanDeursen disclosed confidential information about another CIA, i.e., that Cambria was considering decertifying that CIA.  (*Id*. at ¶ 14).  Cambria verified that the source of that information was VanDeursen.  (*Id*.).  Because VanDeursen recently worked for Cambria, any statement by her about Cambria products and operations, even false or disparaging statements, may be given credibility, and one may never know how deep or widespread the damage will be.  (*Id*.).

These are serious matters which may well become the subject of litigation - - in Minnesota - - as Minnesota is the chosen forum for disputes involving VanDeursen's violations of her Confidentiality and Noncompete Agreement.

    I.    <u>Defendants Removed Plaintiff's Action To This Court And Now Seek Dismissal Of Plaintiff's Complaint</u>

Defendants removed Plaintiff's state court action to this Court on April 28, 2008. Defendants now seek dismissal of the complaint for improper venue and failure to state a claim upon which relief can be granted.

**ARGUMENT**

A.     Rule 12(b)(3) – Dismissal For Improper Venue

"Dismissal is appropriate under Rule 12(b)(3) where a claim is covered by a valid forum selection clause that selects a venue elsewhere." *Gleich v. Tastefully Simple, Inc.*, No. 05-C-1415, 2005 WL 3299187, at *3 (N.D. Ill. Dec. 2, 2005) (Marovich, J) (Minnesota choice of law and forum selection provision precluded suit in Illinois by an Illinois consultant/salesperson against Minnesota food supplier) (citing *Continental Ins. Co. v. M/V Orsula*, 354 F.3d 603, 606 (7th Cir. 2003)).  Where the contract containing the forum selection clause calls for application of a particular State's law, as here, then the chosen State's law determines the question of whether the forum selection provision is enforceable.  *Id.* at *5-6, *6 (citing *Faur v. Sirius Int'l Ins. Corp.*, 391 F. Supp. 2d 650 (N.D. Ill. 2005)).

Minnesota law favors the enforcement of forum selection agreements, which can be avoided as "unfair or unreasonable" only under limited circumstances not present here:

> We hold that when the parties to a contract agree that actions arising from that contract will be brought in a particular forum, that agreement should be given effect unless it is shown by the party seeking to avoid the agreement that to do so would be unfair or unreasonable.
>
> *       *       *
>
> The elements of unreasonableness can be divided into three categories:  (1) the chosen forum is a seriously inconvenient place for trial; (2) the choice of forum agreement is one of adhesion; and (3) the agreement is otherwise unreasonable.

*Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc.*, 320 N.W.2d 886, 890 (Minn. 1982).

The Minnesota Supreme Court cited *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), as a basis for its decision.  *Bremen* holds that a forum selection clause is prima facie valid and should be enforced unless the opposing party shows that enforcement would be "unreasonable

under the circumstances." *Id.* at 889-90 (citing and discussing rationales stated in *Bremen*); *Bremen*, 407 U.S. at 10.  Under Seventh Circuit jurisprudence following *Bremen* and its progeny, a forum selection clause will be enforced unless:  "(1) its incorporation into the contract was the result of fraud, undue influence, or overwhelming bargaining power; (2) the selected forum is so gravely difficult and inconvenient that [the complaining party] will for all practical purposes be deprived of its day in court; or (3) enforcement would contravene a strong public policy of the forum in which the suit is brought declared by statute or judicial decision." *AAR International Inc. v. Nimelias S. A.*, 250 F.3d 510, 525 (7th Cir. 2001).  These factors are substantially the same as those used by the Minnesota courts following *Hauenstein & Burmeister, Inc.* - - the articulated factors place a heavy burden on the party opposing enforcement of the forum selection agreement to establish that doing so would be objectively unreasonable.  *See Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc.*, 646 N.W.2d 905, 909 (Minn. Ct. App. 2002); *Interfund Corp. v. O'Byrne*, 462 N.W.2d 86, 88-90 (Minn. Ct. App. 1990).

In the present case, it is clear that litigation in Illinois must be dismissed in favor of litigation in the contractually selected forum - -  Minnesota - - because it would not be unreasonable to have VanDeursen prosecute her claims in Minnesota.  *See Gleich*, 2005 WL 3299187, at *6-7.  In *Gleich*, Cynthia Gleich sued in Illinois over a dispute relating to the Tastefully Simple Consultant Agreement she had entered into with Tastefully Simple, Inc., a food producer and supplier located in Alexandria, Minnesota (Douglas County).  *See id.* at *1. Similar to VanDeursen, Gleich's position as a consultant for Tastefully Simple required her to promote and sell Tastefully Simple food products at certain dollar volumes.  *Id.*  And, as with VanDeursen's Confidentiality and Noncompete Agreement, Gleich's Tastefully Simple Consultant Agreement contained a Minnesota choice of law and forum provision:  "This

Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota and any and all actions/arbitrations shall be venued in Douglas County, State of Minnesota." *Id.* at *2.

The court had no difficulty enforcing the forum selection provision, dismissing Cynthia Gleich's Illinois lawsuit against Tastefully Simple, Inc. for improper venue under Fed. R. Civ. P. 12(b)(3). *Id.* at *6-7. Applying the factors identified in *Hauenstein & Burmeister, Inc.*, Judge Marovich dismissed Gleich's claim that it was too inconvenient for her to litigate in Minnesota, recognizing that "such factors as proximity of the venue to the plaintiff and witnesses, the location of the courthouse relative to the airport and the number of attorneys nearby," factors VanDeursen predictably will argue to this Court, "are not considered a serious inconvenience." *Id.* at *6 (citing *Alpha Sys.*, 646 N.W.2d 905, 909 (Minn. Ct. App. 2002)). The court also found that Gleich's contract with Tastefully Simple, Inc. was not a "contract of adhesion" because, like VanDeursen, Gleich was not compelled by necessity to enter into the contract, that "Gleich could have contracted with another company to sell its [] products or to sell some other type of product," just as VanDeursen could have gone to work for a company other than Cambria. *Id.* at *7.

In Minnesota, a contract of adhesion is limited to situations where a consumer is compelled to enter into an agreement to obtain a necessary service - -

> "It is a contract generally not bargained for, but which is imposed
> on the public for *necessary* service on a 'take it or leave it' basis.

*Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924-25 (Minn. 1982) (citations omitted) (emphasis in original). VanDeursen's choice to become an employee of Cambria, and to enter into the Confidentiality and Noncompete Agreement, obviously does not fit that definition.

11

"A forum selection clause is otherwise unreasonable if enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought. Judicial economy and the prevention of multiple actions on similar issues are policies which can render a forum selection clause patently unreasonable." *Interfund*, 462 N.W.2d at 89 (citations omitted). Plaintiff can make no showing that Illinois would preclude enforcement of the choice of Minnesota as a forum. *See, e.g., Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 254 (7th Cir. 1996) ("under Illinois law, a court contemplating enforcing a forum selection clause . . . generally considers only one issue: whether the objecting party would effectively be deprived his day in court."); see also, *U.S. Gypsum v. 3M Innovative Properties Co.*, No. 07 C 6381, 2008 WL 514796 (N.D. Ill., February 20, 2008) (Darrah, J).

Moreover, Cambria may enforce the Minnesota forum selection clause against those non-signatories to the Agreement who are so "closely related" to VanDeursen and her dispute over the Agreement "that it becomes 'foreseeable' that [they] will be bound.'" *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209-10 (7th Cir. 1999) (internal citations and quotations omitted); *accord Frietsch v. Refco, Inc.*, 56 F.3d 825, 827-28 (7th Cir. 1995); *see also Organ v. Byron*, 434 F. Supp. 2d 539, 540-41 (N.D. Ill. 2005) (Zagel, J.) (non-signatories to forum selection clause may enforce clause against signatories). Hence, VanDeursen's new employer, Surface Solutions, is bound by the Minnesota choice of forum provision in VanDeursen's Agreement with Cambria, precluding the possibility of a multiplicity of suits in different courts over the Agreement should Surface Solutions actually appear, rather than using VanDeursen to do its bidding. Moreover, Surface Solutions voluntarily availed itself of the Minnesota forum by choosing to become a CIA and attending Cambria University in Minnesota.

As in *Gleich*, plaintiff's Illinois complaint seeking a declaration that her Confidentiality and Noncompete Agreement is invalid must be dismissed for improper venue under Fed. R. Civ. P. 12(b)(3). Clearly, and pursuant to the Agreement, Minnesota is the contractually selected forum for any and all disputes.

> B.　Rules 17(a) and 12(b)(6) – Dismissal Of Action Not Prosecuted By Real Party In Interest

As part of her Complaint, plaintiff requests an order reinstating the alleged "business partnership agreement" between Surface Solutions and the Cambria Defendants, purportedly so that she can sell CAMBRIA products as a Surface Solutions employee. (*See* Plaintiff's Complaint at pp. 4-5, 6) (requesting an order "restoring Surface the right to sell Cambria products under the terms of its business partnership agreement with Cambria so that plaintiff can perform the job for which she was hired"). The Complaint fails entirely to identify any substantive right that Surface Solutions might have to reinstate its business relations with the Cambria Defendants. Simply put, it has none as the relationship was terminable at will - - by either party. More to the point, plaintiff does not allege that any such right belongs to <u>her</u>, as opposed to Surface Solutions. Plaintiff cannot plead on behalf of Surface Solutions and/or attempt to seek relief for Surface Solutions.

Indeed, Rule 17(a) states that "every action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). "This is a procedural rule requiring that the complaint be brought in the name of the party to whom that claim 'belongs' or the party who 'according to the governing substantive law, is entitled to enforce the right.'" *Rawoof v. Texor Petroleum Co., Inc.*, --- F.3d ----, 2008 WL 918486, at *4 (7th Cir. Apr. 7, 2008) (citations omitted). "Under Rule 17 we are concerned only with whether an action can be maintained in the plaintiff's name." *Id.* (citations omitted). Related to Rule 17(a) is the judicial doctrine of "prudential

standing." *Id.* "One well-established prudential-standing limitation is the principle that a litigant cannot sue in federal court to enforce the rights of third parties." *Id.* at *5 (citations omitted). "Some courts have described Rule 17's real-party-in-interest requirement as essentially a codification of this nonconstitutional, prudential limitation on standing." *Id.* (citations omitted).

Clearly, from whatever source the rule derives, VanDeursen cannot sue to enforce Surface Solution's purported right to reinstatement of the alleged "business partnership agreement" it had with the Cambria Defendants. *See id.* "In Illinois, an individual not a party to a contract may only enforce the contract's rights when that contract's original parties intentionally enter into the contract for the direct benefit of the individual." *Cahill v. Eastern Ben. Systems, Inc.*, 603 N.E.2d 788, 792 (Ill. App. Ct. 1992) (citing *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498 (Ill. 1931) and *Wheeling Trust & Saving Bank v. Tremco Inc.*, 505 N.E.2d 1045 (Ill. App. Ct. 1987)). "Courts must determine whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract." *Id.*

The complaint here is devoid of any allegation that the Cambria Defendants and Surface Solutions entered into the purported "business partnership agreement" for the purpose of directly benefiting VanDeursen, *e.g.,* so that she could sell Cambria products as a Surface Solutions employee. As noted above, there is no such agreement between Cambria and Surface Solutions. But even if there were, although VanDeursen might <u>incidentally</u> benefit if Cambria reinstated Surface Solutions as a CIA, there is no allegation in the complaint, nor could such a claim be sustained, that Cambria and Surface Solutions originally contracted for the express and intended purpose of benefiting VanDeursen. *See id.* ("original parties [must] intentionally enter into the contract for the direct benefit of the individual."). Hence, under Illinois law, VanDeursen has no

14

substantive right to make any claim relating to the so-called "business partnership agreement" between the Cambria Defendants and Surface Solutions. *Id.*

The complaint does not allege that Cambria is in breach of a contract or in violation of a common law or statutory duty to refrain from decertifying Surface Solutions as a CIA, or requiring the Cambria Defendants to renew any relationship with Surface Solutions. The complaint identifies no substantive right Surface Solutions might have to compel Cambria Defendants to recommence business relations with Surface Solutions, no less any rights Pam VanDeursen might have in the matter.

VanDeursen's claim for an order "restoring Surface the right to sell Cambria products" fails to state a claim upon which relief can be granted, either as to Surface Solutions or VanDeursen, and must be dismissed. Fed. R. Civ. P. 12(b)(6). But, moreover, if any such substantive right existed (which is not apparent on the face of the pleading), it would exist in favor of and any claim would have to be prosecuted by the real party in interest, i.e., Surface Solutions, not by Pam VanDeursen. *Id.* at R. 17(a); *Rawoof*, _____ F.3d at _____ (citations omitted).

## CONCLUSION

Plaintiff cannot blithely pursue an Illinois action in derogation of the Minnesota choice of law provision in her Agreement. Nor can she pursue purported contract rights, which, if they exist at all, belong to a third party. For the foregoing reasons, the complaint in this action should be dismissed for improper venue and for failure to state a claim upon which relief can be granted.

**DATED: May 1, 2008**                    Respectfully submitted,


                                          **CAMBRIA ENTERPRISES, INC., and**
                                          **CAMBRIA FABSHOP-CHICAGO, INC.,**


                                          By  s/Brian P. Roche
                                               One of Their Attorneys

**Local Counsel**
Thomas J. Piskorski
Brian P. Roche
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

Gregory J. Stenmoe
Steven W. Wilson
Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8400

CH1 11471280.2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on May 1, 2008, **Defendants'**

**Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Complaint** was

electronically filed using the CM/ECF system which will send notification of such filing to all

attorneys of record who have registered for e-mail delivery as listed below:

> Michael E. Lavelle
> Lavelle Law Group, LLC
> 218 North Jefferson Street, Suite 203
> Chicago, IL  60661

> s/Brian P. Roche
> Brian P. Roche

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Pam VanDeursen,

      Petitioner–Plaintiff,

v.

Cambria Enterprises, Inc., a Minnesota
corporation, and Cambria FabShop–Chicago,
Inc., a Minnesota corporation,

      Respondents–Defendants.

Court File No.:_____

**AFFIDAVIT OF
SUSAN GLISZINSKI**

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF HENNEPIN   )

      Susan Gliszinski, being first duly sworn, deposes and states as follows:

      1.     I am the Executive Director, Legal Services with Cambria Company ("Cambria").

I make this affidavit on my personal knowledge.

      2.     Cambria Enterprises, Inc. is a holding company which owns all of the stock of

Cambria Company, a manufacturer and distributor of natural quartz surfaces for kitchens,

bathrooms, fireplace surrounds, and other applications, which are sold under the CAMBRIA

brand.  Cambria FabShop – Chicago, Inc. is also a wholly-owned subsidiary of Cambria

Enterprises, Inc., which fabricates CAMBRIA products.  Each of the Cambria companies above

(collectively "Cambria") has its company headquarters in LeSueur, Minnesota, and all corporate-

level decisions are made and directives are issued from Minnesota.

      3.     Cambria distributes its products through a network of independent installers who

purchase product from Cambria and sell it to end users.  When an installer is approved to sell

**EXHIBIT 1**

CAMBRIA products they become a CAMBRIA Installer Associate (or "CIA"). To become a CIA, the installer's representatives must attend an orientation and informational session in LeSueur, Minnesota called "Cambria University," where they are instructed on Product Knowledge, Cambria Customer Care Procedures, Purchasing Cambria, AutoCAD & Drawing Requirements, Competitive Selling, Marketing, Installation Procedures/Requirements and Finish Work Techniques. CIA's are not required to make any material investment in equipment or facilities to become a CIA. CIA's are not required to sell CAMBRIA products exclusively. To the contrary, most CIA's carry multiple product lines.

    4.    When a supplier becomes an approved CIA, the supplier is issued a single, controlled copy of the CAMBRIA FabShop System Business Operating Requirements Manual (the "BORM"). The BORM is a confidential document which contains detailed instructions relating to AutoCad Drawing, Field Installation, and Finish Work for CAMBRIA products. It does not create any contractual business relationship between the parties, nor does the BORM address any such business relationship. In essence, the BORM is an installation guide, nothing more and nothing less. If a CIA is "decertified" by Cambria, the supplier must return the BORM to Cambria.

    5.    Neither Cambria nor any of its affiliates enter into any form of supplier or distributorship agreement with CIAs. The only documentation provided to the supplier is the BORM, and any updates to the BORM. The relationship between Cambria and CIAs is that of supplier/fabricator and installer, and the relationship is terminable at the will of either party without notice.

    6.    On December 7, 2005, Cambria offered Plaintiff a position as a Market Representative. Attached hereto as Exhibit A is a true and correct copy of the offer letter. That

offer was made "contingent upon you signing the Confidentiality and Non-Compete Agreement that will be sent to you, [which] needs to be executed and returned to me by your first day of work." The Agreement was sent to plaintiff, and she signed it effective January 1, 2006. Attached hereto as Exhibit B is a true and correct copy of the Pam VanDeursen's fully-executed Confidentiality and Noncompete Agreement.

7.    Cambria is facing irreparable harm in relation to Pam VanDeursen's employment with Surface Solutions. Pam VanDeursen is a disgruntled ex-employee who is or may become employed by a disgruntled ex-supplier, Surface Solutions, each of whom is positively incented to deflect sales away from CAMBRIA products toward competitors' products, and one of whom, VanDeursen, is possessed with detailed and intimate knowledge regarding Cambria's business plans and strategies, CIA performance and other information, who the best retailers are, customer information, who is purchasing Cambria products, and like information — which she received only because she was an employee of Cambria — and which could be used to assist her and Surface Solutions in deflecting sales away from Cambria.

8.    That is why Cambria entered into the Confidentiality and Noncompete Agreement with VanDeursen, to precludes her from accepting employment with a competitor like Surface Solutions, i.e., from being "involved in any activities in direct competition with the business of Employer." As a seller of products competitive with Cambria, Surface Solutions clearly is a prohibited employer. Moreover, the Agreement calls for application of Minnesota law and selects a Minnesota district court as the forum for any dispute relating to the Agreement: "12. Choice of Law/Forum. This Agreement shall be construed and determined according to the laws, jurisdiction and venue of the State of Minnesota, and any disputes arising out of this Agreement shall be determined in a Minnesota District Court."

9.    On April 10, 2008, I sent letters via certified mail, return receipt requested to both Pam VanDeursen and Surface Solutions reminding and informing them, respectively, of Pam VanDeursen's obligations under her Confidentiality and Noncompete Agreement, and requesting a response from Surface Solutions by April 20, 2008. Attached hereto as Exhibits C and D, respectively, are true and correct copies of those letter. Gary Linze of Surface Solutions responded to me by a letter dated April 18, 2008, requesting until April 24, 2008 "to address your accusations," a true and correct copy of which is attached hereto as Exhibit E. I directed my assistant to contact Mr. Linze to inform him that the requested extension of time would be acceptable, which my assistant did, and to which Mr. Linze responded "thank you."

10.    By facsimile transmission shortly after 6:00 p.m. on April 24, 2008, I received Mr. Linze's response — copies of a Cook County complaint for declaratory and injunctive relief and papers related to a motion for TRO, with a hearing date set for April 29, 2008 before state court judge Mason, all of which apparently had been filed with the Circuit Court of Cook County earlier in the day on April 24, 2008. To my view, Mr. Linze's request for an extension of time was a deception, it was an attempt to prevent and/or delay Cambria from taking legal in Minnesota, as the Agreement requires, while Ms. Van Deursen and Mr. Linze prepared a pre-emptive lawsuit in Illinois.

FURTHER AFFIANT SAITH NOT.

_Susan Gliszinski_
Susan Gliszinski

Subscribed and sworn to before me
this 30ᵗʰ day of April, 2008.

_Lisa Grossman_
Notary Public



LISA L. GROSSMAN
Notary Public
Minnesota
My Commission Expires Jan. 31, 2012

2170539v2                                            4

04/25/2008  12:46   5076654403              CAMBRIA                      PAGE  17/37



# CAMBRIA®
*Quality Quartz Surfaces*

December 7, 2005

Ms. Pamela Lynne VanDeursen
P.O. Box 270
Wayne, IL. 60184

Dear Pam,

On behalf of Cambria, I am pleased to confirm our offer for the position of Market Representative. Your starting compensation will be $5000.00 per month, paid semi-monthly. A car allowance of $650.00 per month will be provided. Your anticipated start date is January 1, 2006 with a report date of January 3, 2006. As we discussed, this offer is contingent upon a successful completion of our reference/background check.

In addition to your compensation, you will be eligible to receive Cambria's fringe benefits, effective the first of the month following one month of employment. For your review, I have enclosed a copy of our Davis Family Holdings Benefit Summary that provides an overview of our benefits package. Effective August 1, 2005 the employee contribution for a single plan is $70.00 per month and $175.00 per month for a family plan. Additionally, I have also enclosed a copy of our 401(k) Plan Highlights.

Regarding the 401(k) Plan, you are immediately eligible to defer your own compensation into the plan and will be eligible for a dollar for dollar match up to 4% of your compensation on the first of the quarter following one year of employment.

This offer of employment is contingent upon you signing the Confidentiality and Non-Compete Agreement that will be sent to you, and needs to be executed and returned to me by your first day of work. I also need to confirm that you are not subject to any type of written or oral non-competition agreement, confidentiality agreement, or any other agreement that would prevent you from accepting employment with Cambria. We do not expect you to bring to Cambria any proprietary information from any previous employer.

I will need you to fax or send completed disclosure forms and an application for the background and reference check to Theresa Schermerhorn, Human Resources Manager for Cambia. See enclosed forms.

31496 Cambria Avenue Le Sueur, MN 56058
507-665-5003  1-866-CAMBRIA  Fax 507-665-4403
www.CambriaUSA.com

THE ONLY UNITED STATES PRODUCER OF QUARTZ

Gliszinski                                Exhibit A
Aff.

CONFIDENTIALITY AND NONCOMPETE AGREEMENT

This Confidentiality and Non-Compete Agreement is entered into as of January 1, 2006 between Cambria Enterprises, Inc., a Minnesota corporation located at 704 North Main Street in LeSueur, MN 56058, and its subsidiaries and any affiliate thereof (collectively, "Employer"), and Pamela Lynne VanDeursen who resides at PO Box 270, Wayne IL, 60184 (Employee).

RECITALS:

A.     Employer is engaged in the manufacture and sale of quartz surfaces.

B.     Employee acknowledges that he/she will be employed in a position of trust and confidence and will have access to and will become familiar with the products, methods, technology, services and procedures used by Employer.

C.     Employee acknowledges that Employer has expended significant time and money on promotion, advertising and the development of goodwill and a sound business reputation. Employer has developed a list of customers and spent time and resources to learn the customers' needs for Employer's services and products. Employer also has entered into business relationships designed to discover likely future customers. All of the foregoing are valuable, special and unique assets of Employer's business. Employee acknowledges that the Employer's customer lists, including future changes to the customer lists, are confidential information which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

D.     Employee acknowledges that Employer has expended significant time and money on technology, research, and development. Employer has developed products, processes, technologies and services, which are valuable, special and unique assets of Employer's business. Employee acknowledges that the products, processes, technologies and services, including future changes thereto, are confidential information, which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

E.     Employee recognizes that the disclosure to or use by third parties of any of the Employer's confidential or proprietary information, trade secrets, or Employee's unauthorized use of such information would seriously harm Employer's business and cause monetary loss that would be difficult, if not impossible to measure.

F.     Employee wishes to enter into a new employment relationship with Employer whereby he/she receives the independent consideration offered in this Agreement and whereby he/she receives access to confidential information and existing and prospective customers.

NOW, THEREFORE, the parties hereby agree as follows:

1.     Independent Consideration.  Employee acknowledges that Employer's offer of at-will employment was expressly conditioned upon Employee's acceptance of the terms of this Agreement. Employee enters into this Agreement in consideration for Employer's offer of at-will employment and in consideration for the terms and conditions hereof.

2.     Definitions.  The following terms as used herein shall have the following meanings:

a.     "Confidential Information" means any information which is proprietary or unique to Employer, including but not limited to, trade secret information, matters of a technical nature such as processes, devices, manufacturing equipment, techniques, data and formulas, test samples, specifications and characteristics of products planned or being developed, research subjects and results, marketing plans and strategies, operations, products, revenues, profits, sales, key personnel, customers, suppliers, pricing policies, any information concerning the business affairs and methods of Employer, which is not readily available to the public, and any information Employer has indicated is confidential.

b.     "Intellectual Property" means any idea, invention, improvement, discovery, process, design, computer program, user interface and related documentation or work of authorship relating to the existing or contemplated business or research of Employer or resulting from Employee's work for Employer, whether patentable,

**Exhibit B**

copyrightable or susceptible to other forms of protection, in any stage of development, and whether or not Employer uses, registers or markets the same.

        c.     "Intellectual Property Rights" means all intellectual property rights, including but not limited to, all patent, copyright, trademark, and trade secret rights recognized under state, federal or common law in the United States, foreign countries and all international conventions.

        3.     <u>Covenant to Protect Confidential Information</u>.  Employee acknowledges that in connection with employment by Employer, he/she will be brought into contact with Confidential Information. In consideration of the opportunity to receive Confidential Information, Employee covenants and agrees that:

        a.     He/she will not disclose to any person or entity any Confidential Information, either during or after the term of his/her employment, except to designated employees of Employer (only as such employees need such information and are designated by Employer as needing such information), and attorneys, accountants or other representatives of Employer as may be necessary or appropriate in the ordinary course of performing his/her duties as an Employee of Employer, or otherwise with Employer's express prior written consent.

        b.     He/she will not disclose or transfer any Confidential Information to any third party without the express prior written consent of Employer.

        c.     He/she will deliver to Employer promptly upon termination of his/her employment, or at any other time that Employer may so request, all memoranda, notes, records (including electronic data records), reports and other documents (and all copies thereof) relating to the Confidential Information which he/she may then possess or have within his/her control.

        4.     <u>Termination of Obligation of Confidentiality</u>.  The confidentiality obligations imposed by this Agreement shall cease to apply to Confidential Information (but not test samples) after the <u>earliest</u> of the date on which Employee provides Employer with written evidence clearly establishing that the Confidential Information which has been treated by Employer as Confidential Information: (i) was known to Employee before it was obtained from Employer; (ii) was publicly available on the date of first receipt from Employer; (iii) has become generally known to the public in the United States through no fault of Employee; (iv) has been disclosed to Employee free of any obligation of confidentiality by a third party who has the right to disclose the same and who did not derive the information from Employer; or (v) was independently developed by Employee without the use of Employer's Confidential Information.

        5.     <u>Obligations with respect to Developments</u>.  With respect to Developments made, created or conceived by Employee while employed by Employer, either independently or jointly with others, whether during Employer's normal working hours or thereafter, Employee acknowledges that such Developments and the Intellectual Property Rights thereto belong solely to Employer.  Until proven otherwise, any Development made or created by Employee within one (1) year after Employee's termination of employment with Employer shall be presumed to have been conceived by Employee during his/her employment with Employer. Accordingly, Employee shall therefore:

        a.     promptly and fully inform Employer in writing of Developments made, created or conceived during his/her term of employment or within one year thereafter;

        b.     assign (and Employee does hereby assign) to Employer all his/her ownership in and Intellectual Property Rights to such Developments; and

        c.     assist Employer as requested during and after his/her employment to evidence, perfect and enforce Employer's Intellectual Property Rights in and ownership of such Developments, by promptly executing and delivering to Employer (without charge to Employer but at the expense of Employer), the necessary written instruments, and by performing such other acts as may be necessary in the opinion of Employer so as to enable Employer to obtain and maintain Letters Patent or other Intellectual Property Rights in such Developments, and so as to vest the entire right and title thereto in Employer.

Notwithstanding anything herein to the contrary, the parties agree that the assignment provisions of this Agreement are written to be in accordance with and shall be interpreted consistent with Minnesota Statute Section 181.78, Subdivision 1, which states as follows:

Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

6.      _Agreement not to Compete._  Employee hereby covenants and agrees with Employer and for the benefit of Employer, that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, on Employee's own behalf or on behalf of any third party, Employee will not perform, engage in or otherwise be involved in any activities in direct competition with the business of Employer, directly or indirectly, anywhere in the United States and in those foreign countries in which the Employer operates (the "Territory").

7.      _Nonsolicitation; Nondisparagement._  Employee acknowledges and agrees with Employer that during the course of Employee's employment with Employer, Employee has had and will continue to have the opportunity to develop relationships with existing employees, customers and other business associates of the Employer, which relationships constitute goodwill of Employer, and Employee acknowledges and agrees that Employer would be irreparably damaged if Employee were to take actions that would damage or misappropriate such goodwill. Employee accordingly covenants and agrees that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, Employee will not:

a.      solicit, divert or hire away, or in any manner attempt to solicit, divert or hire away, directly or indirectly, on Employee's own behalf or on behalf of others, any employees of the Employer, or any persons who have been employees within six months, to any competitor of the Employer, or

b.      directly or indirectly enter into, engage in, assist, give or lend funds to or otherwise finance, be employed by or consult with, or have a financial or other interest in, any business which competes with any of the Employer within the Territory, whether personally or as an independent contractor, agent, stockholder, partner or joint venturer for any other person, provided that the aggregate ownership by Employee of no more than two percent of the outstanding equity securities of any person, which securities are traded on a national or foreign securities exchange, quoted on the Nasdaq Stock Market or other automated quotation system shall not be deemed to be giving or lending funds to, otherwise financing or having a financial interest in a competitor, or

c.      solicit any customer of any of the Employer  (including any customer as of the date of termination, or any person that has contracted or been solicited by or referred to Employer for purposes of becoming a customer of the Employer, and whom it is reasonably expected will become a customer), to purchase or distribute information, products or services of or on behalf of Employee or such other person that are competitive with the information, products or services provided by the Employer, or

d.      take any action that is reasonably likely to cause injury to the relationships between the Employer or any of its employees and any lessor, lessee, vendor, supplier, customer, distributor, employee, consultant or other business associate of any of the  as such relationship relates to the business of Employer .

Employee understands that the foregoing restrictions may limit the Employee's ability to earn a livelihood in a business similar to the business of the Employer, but Employee nevertheless believes that Employee has received and will receive sufficient consideration and other benefits as an employee of Employer and as otherwise provided hereunder to clearly justify such restrictions which, in any event (given Employee's education, skills and ability), Employee does not believe would prevent him from otherwise earning a living.

3

8.    <u>Stipulated Reasonableness.</u>    Employee acknowledges that the nature of Employee's position, the period of time necessary to fill Employee's position in the event Employee's employment is terminated, the period of time necessary to allow customers of Employee's business to become familiar with Employee's replacement in the event Employee's employment is terminated, and the period of time necessary to obliterate the identification between Employer and Employee in the minds of Employer's customers, commands that the two (2) year non-competition period be imposed hereunder for the protection of Employer's investment in its business. Employee further agrees that the restrictions contained in this Agreement shall apply no matter how or why his/her employment terminates and regardless of whether the termination is voluntary or involuntary. Employee further agrees that the restrictions contained in this Agreement shall survive the termination of his/her employment.

9.    <u>No Conflict.</u>  Employee represents that he/she is not bound or restricted by a non-competition agreement, a confidentiality or non-disclosure agreement, or any other agreement with a former employer or other third party, which would conflict with this Agreement or Employee's employment with Employer. Employee further agrees that he/she will not use any trade secrets or other intellectual property belonging to any third party while performing services for the Employer.

10.    <u>Remedies.</u>  In the event of the violation or threatened violation by Employee of any of the covenants contained in this Agreement, in addition to any other remedy available in law or in equity, Employer shall have (i) the right and remedy of specific enforcement, including injunctive relief, it being acknowledged and agreed that any such violation or threatened violation will cause irreparable injury to Employer, and that monetary damages will not provide an adequate remedy to Employer; and (ii) rights to any and all damages available as a matter of law, and costs and expenses incurred by Employer in pursuing its rights under this Agreement, including reasonable attorneys' fees and other litigation expenses.

11.    <u>Severability.</u>  Should any covenant, term or condition contained in this Agreement become or be declared invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court shall be requested to judicially modify such unenforceable provision consistent with the intent of this paragraph so that it shall be enforceable to the fullest extent possible.

12.    <u>Choice of Law/Forum.</u>  This Agreement shall be construed and determined according to the laws, jurisdiction and venue of the State of Minnesota, and any disputes arising out of this Agreement shall be determined in a Minnesota District Court.

13.    <u>Amendments; Waivers.</u>  This Agreement may be amended, modified, superseded or cancelled, and the terms or covenants waived, only by a written instrument executed by both of the parties hereto or, in the case of a waiver, by Employer. The failure to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver of any term, whether by conduct or otherwise, shall be deemed to be a further or continuing waiver of any such breach, or a waiver of the breach of any other term contained in this Agreement.

14.    <u>Binding Effect.</u>  This Agreement shall be binding upon and inure to the benefit of Employer and its successors and assigns.

15.    <u>Survival.</u>  Notwithstanding any termination of Employee's employment, this Agreement shall survive.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the day and year first above written.

CAMBRIA ENTERPRISES, INC.                                EMPLOYEE

By _~John N. Velguyl~_                                   _~Pamela VanDaman~_

Its _____

4

04/25/2008 09:10 FAX  952 826 6223          DAVISCO FOODS                      ☑0004/0043



# C A M B R I A®

Natural Quartz Surfaces™

April 10, 2008

Pam Van Deursen
561 South Drive                    **VIA CERTIFIED MAIL,**
South Elgin, IL 60177              **RETURN RECEIPT REQUESTED**

Re:  Confidentiality and Non-Compete Agreement

Dear Ms. Van Deursen:

Attached please find a copy of the Confidentiality and Non-Compete Agreement
dated January 1, 2006 between you and Cambria. Please note your ongoing
obligations under this Agreement, particularly with respect to your obligations of
non-compete, confidentiality and non-disclosure.

As a member of our team, you were privy to a substantial amount of Cambria's
confidential information, including, but not limited to: trade secret information,
matters of a technical nature such as processes, devices, manufacturing
equipment, techniques, data and formulas, test samples, specifications and
characteristics of products planned or being developed, research, marketing plans
and strategies, operations, products, revenues, profits, sales, customers, customer
lists, suppliers, pricing policies, employee lists and the like.

Cambria has reason to believe that you are contemplating or have accepted
employment with Surface Solutions, Inc., which Cambria considers a violation of
your agreement.

Breach of your agreement is a very serious matter. If you have or are
contemplating any breach, we will act swiftly and aggressively to enforce the
agreement. You should also be aware that we have advised Surface Solutions of
your responsibilities, as they too have a responsibility not to induce you to violate
your agreement.

If you have any questions regarding your responsibilities under this agreement,
please feel free to contact me at 952-944-1676.

Sincerely,

Sue Gliszinski
Enc.

704 North Main Street, P.O. Box 69
Le Sueur, MN 56058
507-665-4555  1-866-CAMBRIA  Fax 507-665-3701
www.CambriaUSA.com

THE ONLY PRODUCER OF QUARTZ SURFACES IN THE UNITED STATES

**Exhibit C**

04/25/2008 09:09 FAX  952 826 6223          DAVISCO FOODS                      ☑0002/0043





# C A M B R I A°

Natural Quartz Surfaces™

April 10, 2008

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND FAX

Surface Solutions, Inc.
Attn: Gary Linze and Troy Ellsoos
1500 Foundry Park, Suite #1
St. Charles, IL 60174

Re:  Pam Van Deursen/Confidentiality and Non-Compete Agreement

Dear Mr. Linze and Troy Ellsoos:

It is my understanding that you have encouraged Ms. Van Deursen to leave her
employment with Cambria in order to work for Surface Solutions, Inc., despite
your knowledge that she has a non-compete/confidentiality agreement with
Cambria.

This will confirm that Pam Van Deursen indeed has a written confidentiality and
non-compete agreement with Cambria, a copy of which is enclosed.  Among other
things, this agreement includes a covenant not to compete that is in effect for two
years after leaving Cambria's employ.  In addition, the agreement also provides
strict confidentiality and non-disclosure provisions to which Ms. Van Deursen
must abide.

Ms. Van Deursen has confidential and proprietary information that belongs to
Cambria. Cambria has reason to believe that she has accepted a job with your
company, despite Cambria's representations to you and Ms. Van Deursen that we
consider this a violation of the confidentiality and non-compete agreement.

If this information is correct, Ms. Van Deursen is in violation of her agreement.
In addition, you are interfering with Cambria's contract with Ms. Van Deursen,
and may be liable to Cambria for tortious interference with contract.

Please be advised that we insist that you and your representatives cease all
unlawful solicitations immediately and retract any outstanding offer of
employment to Ms. Van Deursen, or otherwise correct this situation. We must
receive a response from you by April 20, 2008, or we will assume that you intend
to proceed with your legal violations, despite your clear and obvious knowledge
of the existence of this non-compete agreement and other trade
secret/confidentiality issues.

704 North Main Street, P.O. Box 69
Le Sueur, MN 56058
507-665-4555  1-866-CAMBRIA  Fax 507-665-3701
www.CambriaUSA.com

THE ONLY PRODUCER OF QUARTZ SURFACES IN THE UNITED STATES

**Exhibit D**

Surface Solutions, Inc.
Page 2
April 10, 2008


Although Cambria would prefer to avoid litigation, be advised that we will pursue
all legal rights and remedies if you do not correct this situation immediately.

I look forward to an immediate response.


Sincerely,

Sue Gliszinski
952-944-1676
Fax: 952-826-6223

Enc.





1500 Foundry Park, Suite 1
St. Charles, IL 60174
630-587-3131
630-587-5985 Fax

April 18, 2008

VIA: Facsimile and USPS

Sue Gliszinski
Cambria Business Office
704 North Main Street
P.O. Box 69
Le Sueur, MN 56058

Re: Pamela VanDeursen Confidentiality and Non-Compete Agreement

Dear Ms. Gliszinski

In response to you letter dated April 10, 2008 ~ we have not had adequate time to discuss with our attorneys and respectfully request until April 24, 2008 to address your accusations. Thank you.

Sincerely,

Gary Linze
President

**Exhibit E**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Pam VanDeursen,

      Petitioner–Plaintiff,

v.

Cambria Enterprises, Inc., a Minnesota
corporation, and Cambria FabShop–Chicago,
Inc., a Minnesota corporation,

      Respondents–Defendants.

Court File No.:_____

**AFFIDAVIT OF
PATRICK SIMONETT**

STATE OF ILLINOIS    )
                  ) ss.
COUNTY OF KANE     )

      Patrick Simonett, being first duly sworn, deposes and states as follows:

      1.    I am a District Manager for Cambria ("Cambria") in the Chicago area. In that role, I was Pam VanDeursen's direct supervisor for the last approximately six (6) months prior to her leaving Cambria. I make this affidavit on my personal knowledge.

      2.    Pam worked for Cambria as one of three Market Representatives in Chicagoland. Cambria sells its natural quartz surface products through a network of independent supplier/installers, all of whom are certified as Cambria Installation Associates ("CIAs"). It was Pam's duty to recruit potential CIAs in her territory. Additionally, Pam was responsible for stimulating demand for Cambria products within her territory, by doing things such as attending trade shows and conferences and visiting CIA retail locations, developers, architects, builders, and contractors.

**EXHIBIT 2**

APR-30-2008 04:52P FROM:                                    TO:16129778650          P.2

3.    As part of her duties as a Marketing Representative, Pam was very familiar with Cambria's business plans and strategies, supplier/installer base and performance, customer base, and customer preferences in Chicago and most of Northern Illinois. Pam actively participated in management meetings where that information was shared and discussed, and she played an active part in developing Cambria's sales and marketing strategies. Information about Cambria's business plans and strategies, supplier/installer base and performance, customer base, and customer preferences is confidential, not shared outside of Cambria, and is subject to reasonable secrecy measures, such as the Confidentiality and Noncompete Agreement that Pam executed before going to work for Cambria.

4.    Surface Solutions, Inc. ("Surface Solutions") was one of seven (7) CIAs within Chicagoland. Pam was responsible for generating enthusiasm and promotion of Cambria products at Surface Solutions. Pam was not effective in doing so. In 2007, Surface Solutions sold less than $60,000 in Cambria products. By the first quarter of 2008, Surface Solutions was selling only about one kitchen per month, or its equivalent (about 80 square feet, or $4,000 in product), in Cambria products, making Surface Solutions one of the poorest performing CIAs in the Great Lakes 2 District, of which Chicagoland is a part, if not the worst performer out of a total of 14 CIAs in the District.

5.    Surface Solutions represented 15 or more surface products in addition to Cambria products — including competing quartz surfaces from Zodiaq, Silestone, Caesar Stone, and Technistone. Attached hereto as Exhibit A is an entry from the Surface Solutions, Inc – Product Catalog, that I reviewed on their website, www.sstops.com.

6.    Cambria is the industry leader in natural quartz surfaces. It was apparent to me and my boss, Peter Martin, that Surface Solutions was using its position as a certified Cambria

supplier to engage in a practice known in our industry as "flipping," using the prominence of the Cambria brand and image to draw customers into its locations, then diverting customers to competitors' products, on which Surface Solutions presumably had better margins or terms. This reflected poorly on Pam because it was Pam's principal responsibility to increase sales of Cambria products with her CIA's, and to prevent stagnant or declining sales of Cambria within her territory.

7.    I discussed with Pam several times in 2007 and early 2008 the poor performance of Surface Solutions and how Pam's performance as a Market Representative was under scrutiny, in part, as a result of the poor performance of Surface Solutions as a CIA. Pam clearly recognized that Surface Solutions was not performing at a satisfactory level. In her last two call reports dated January 31 and February 8, 2008, respectively, Pam herself rated Surface Solutions' "Call Status" as "Struggling with Cambria integration." At a meeting on February 20, 2008, with Peter Martin, myself, Pam and three other Market Representatives, we had a serious discussion about the poor sales performance of Surface Solutions, concluding that at best Surface Solutions was a marginal performer, and all agreed that Surface Solutions should be decertified as a CIA. Pam VanDeursen herself ~~recommended and~~ agreed at that meeting on February 20, 2008 that Surface Solutions be decertified.

8.    On February 29, 2008, I placed Pam on 30-day performance plan. In addition to her difficulties with Surface Solutions as a CIA, my boss, Peter Martin, and I determined that we needed to focus Pam's efforts on sales and sales activities, and to keep a very tight reign on her day-to-day work, as she was not exhibiting anything close to the level of effort, either as to quantity or quality, that we were expecting out of our Market Representatives.

9.     On March 11, 2008, about midway through her performance plan review period, Pam called me and told me that she agreed that she was not performing her job adequately and that she intended to resign from her employment with Cambria. On March 14, 2008, at Pam's request, I met her at a gas station nearby her home to drop off personal items she had left in the office. She told me then that she may have an "opportunity" at Surface Solutions, but she did not elaborate further, and was also considering another "opportunity" out West. She did not tell me that she had accepted a position at Surface Solutions, though. Although Pam performed no services for Cambria after March 13, 2008, Cambria paid Pam for an additional two weeks.

10.     On or about April 4, 2008, I visited the Surface Solutions offices in St. Charles, Illinois and personally informed the owners of Surface Solutions, Gary Linze and Troy Ellsoos, of the decision that had been made to decertify Surface Solutions as a CIA. I also inquired about the rumor I had heard about Pam VanDeursen possibly going to work for them, to which Mr. Linze advised me that he had indeed hired her and told me she was to start working on Monday, April 7, 2008. I told them that Pam had a Confidentiality and Noncompete Agreement with Cambria. I asked them if Pam had explained to them that she had a noncompete agreement with Cambria, to which they had no response. At that meeting, I also requested that Mr. Linze and Mr. Ellsoos return the Cambria Installer Associates Business Operating Manual (the "BORM"), which they did.

11.     I informed my boss, Peter Martin, that Surface Solutions intended to hire Pam VanDeursen. Within a week, Cambria wrote Pam VanDeursen and Surface Solutions about Pam's duties under her Confidentiality and Noncompete Agreement, including that she could not go to work for Surface Solutions in competition with Cambria.

APR-30-2008 04:53P FROM:                          TO:16129778650          P.5

12.     Within the last two to three weeks, rumors have been circulating that Cambria is experiencing production delays of up to six weeks, which is patently false, but is extremely harmful to Cambria business.  In the construction and renovation business, builder/remodelers and property owners very often base their product decisions on availability.  A delay of more than two to three weeks would likely preclude a builder/remodeler or owner from selecting that product — they will move on to a similar product that is more readily available.

13.     In one instance, a Cambria retailer was told by Surface Solutions that Cambria was out six weeks, and the retailer relayed that information to a certified CIA, who then called our Market Representative who relayed the information to me.  Our Market Representative told the CIA that was not true, and he should clear that up with the retailer.  In another instance, an installer from South Beloit was told by an employee at Surface Solutions that Cambria was out six weeks, and the installer asked me if that was the case.  I told him that Cambria is not having any production or delivery issues and that Cambria is running at or shorter than 10 days, not six weeks.  This kind of disparagement in the marketplace is potentially extremely damaging to Cambria, and Surface Solutions is the source of it.

14.     Additionally, (after she left Cambria) Pam VanDeursen disclosed confidential information about another CIA, i.e., that Cambria was considering decertifying that CIA.  We verified that the source of that information was Pam VanDeursen.  Because VanDeursen recently worked for Cambria, any statement by her about Cambria products and operations, even false or disparaging statements, may be given credibility, and one may never know how deep or widespread the damage will be.

15.     Responding to some of things in Gary Linze's affidavit, Cambria has no written agreement with any of its CIAs.  The only document is the BORM, which is an operations and

2170509v2                                    5

APR-30-2008 04:53P FROM:                                TO:16129778650          P.6

procedures manual not a contract. We do not refer to CIAs as "Cambria business partners" or enter into any "business partnership agreement" or anything of the kind. We can decertify a CIA for any reason at any time, and a CIA could choose to stop selling our product for any reason at any time, if it wanted to.

16.    Surface Solutions' total sales of Cambria products for the entire year of 2007 was only $56,172. I am aware of only two sales in 2008 totaling about $9,000 before Surface Solutions was decertified on April 4, 2008. In total, Surface Solutions sold less than $70,000 in product in over a year, not $115,000 in the first 12 months. Mr. Linze's numbers in paragraphs 7 and 15 of his affidavit are wrong.

17.    I had a very short conversation with Mr. Linze at the Midwest Builders Show in early March, 2008, at which time I mentioned our serious concern about Surface Solutions' level of sales. At no time during this conversation did Mr. Linze mention that he was hoping to hire Pam VanDeursen.

18.    I had a conversation with Mr. Linze about a week later, which lasted less than one minute, at our Chicago FabShop offices. I spoke with Mr. Linze for the purpose of setting up a date and time for me to meet with him at his offices (it being my intention to notify Surface Solutions that they are decertified and to pick up the BORM). He did not bring up the subject of hiring Pam during this discussion.

19.    Paragraph 16 of Mr. Linze's affidavit raises the question "where did he get that information?" Pam VanDeursen would be the only source of such information available to Mr. Linze, as the relative performance of CIAs is confidential and not shared with other CIAs. In any event, Mr. Linze's assertion is wrong. Surface Solutions stood out as a terrible performer, with only one other CIA potentially in the same category.

FURTHER AFFIANT SAITH NOT.

Patrick Simonett                    4/30/08

Subscribed and sworn to before me
this _30th_ day of _april_ , 2008.

Notary Public    _Com Exp. 06-19-11_

Surface Solutions, Inc.® - www.sstops.com

Home    About Us    Products    Quotes    Cl

**Surface Solutions, Inc. ®**

800-916-T

Product Catalog
As mentioned earlier, our product line is quite extensive



Counter Tops

**Laminate:**

- Formica
- Wilson Art
- Pionite
- Nevamar

**Solid Surface:**

- Corian
- LG - HiMacs
- Avonite
- Meganite
- Northstar Collection

**Natural Stone:**

- Granite
- Marble
- Limestone
- Soapstone

**Engineered Stone:**

- Zodiaq
- Silestone
- Ceasar Stone

Surface Solutions, Inc.® - Product Catalog                                    Page 2 of 2

- Technistone

---



Cabinets

Kitchen and bath cabinets by Pace Industries - fine quality cabinets, made here in Chicago, available at very efficient lead times.

---



Accessories

We know how busy you can be and how much time can be wasted with the 'little things'. That is why we offer sinks, faucets, and miscellaneous items to finish the job. Inquire with our sales staff for a complete list of offerings.

---

Surface Solutions, Inc.® - www.sstops.com

©Copyright 2005 Surface Solutions, Inc.® All Rights Reserved
For more Information Contact Us

Home    About Us    Products    Quotes    Cl
W
Advanced Business C

Surface Solutions, Inc.®- About Us

Surface Solutions, Inc.® - www.sstops.com                    Home    About Us    Products    Quotes    Cl

## Surface Solutions, Inc. ®                                                   800-916-T

About Us

We are located in beautiful St. Charles, IL about 25 miles west of Chicago. From this location, we provide all of our products under one roof. We deliver our products on our own trucks to the entire Chicagoland area, including Milwaukee and Southwest Indiana. You can contact us by phone at 1-800-916-8677 (TOPS) or by fax at 1-800-913-8677 (TOPS).

In our quest to become the 'premier' full service countertop supplier in the area, we strive to keep quality high while maintaining competitive pricing. Our goal is to treat our customers the way we would like to be treated ourselves. We pride ourselves on maintaining a highly qualified staff that handle your needs in a professional, courteous manner and look forward to making your experience with us a satisfying one.



## Company History

Surface Solutions, Inc.® was incorporated in July of 2002 when owners Gary Linze and Troy Ellsoos, working together for over five years, came to realize that even though successful, we could do a better job. We set out with that thought in mind, and quickly found quality employees eager to join us. We established an instant client base that believed in us and the word and our reputation spread. We found our recipe worked and after only one year, had to relocate out of our 10,000 square foot facility into a new 20,000 square foot modern facility. Complete with showroom, conference room, and multiple offices, with only two years into it, plans were made to add a new 10,000 square foot stone shop. As a company, we have sponsored the Midwest Builders Show in Rosemont. Becoming a member of the "M.S.F.B.", we have also sponsored various other benefits with Builders.



We are considered one of the fastest growing shops in the region and we are certified to fabricate and install Corian and Zodiaq by DuPont, Hi-Macs and Caesar of Technistone. We have furnished such clients as Sears, Siegles, Lowe's, IKEA, and Kimball Hill Homes, just to mention a few.

Surface Solutions, Inc.® - www.sstops.com

©Copyright 2005 Surface Solutions, Inc.® All Rights Reserved
For more information Contact Us

Home    About Us    Products    Quotes    Cl
W
Advanced Business C

Surface Solutions, Inc.® - Clients

Surface Solutions, Inc.® - www.sstops.com                    Home    About Us    Products    Quotes    Cl

**Surface Solutions, Inc. ®**                                                   800-916-T

Our Clients
A sample of our satisfied clientele would include:

- Sears Remodeling
- Walsh Construction
- Kimball Hill Homes
- Lowe's
- Seigle's
- IKEA
- Pace Cabinets
- Homemakers Supply
- BDA Cabinet Distributors
- Baird & Warner
- Chicago Housing (C.H.A.)
- Chicago Police Department
- Tealander Construction







Surface Solutions, Inc.® - www.sstops.com                    Home    About Us    Products    Quotes    Cl

©Copyright 2005 Surface Solutions, Inc.® All Rights Reserved
For more information Contact Us

W
Advanced Business C