THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAM VanDEURSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **No. 08 CV 2416** |
| | ) | **Judge Darrah** |
| CAMBRIA ENTERPRISES INC., a Minnesota | ) | **Mag. Judge Keys** |
| Corporation, and CAMBRIA FABSHOP - | ) | |
| CHICAGO INC., a Minnesota corporation, | ) | **(Removed from Circuit Court of Cook** |
| | ) | **County, Illinois, Case No. 08 CH 15281)** |
| Defendants. | ) | |

## SECOND PETITION FOR TEMPORARY RESTRAINING ORDER

NOW COMES the plaintiff, by and through her attorneys, LAVELLE LAW GROUP, LLC, and for her second petition for a temporary restraining order (plaintiff's first petition was dismissed without prejudice) pursuant to Fed.R.C.P. 65(b), states as follows:

## PARTIES AND BACKGROUND

1.  Plaintiff Pam VanDeursen is an Illinois resident and former employee of defendant Cambria Enterprises, Inc., and/or defendant Cambria FabShop - Chicago Inc. (hereinafter generally "Cambria").

2.  Defendant Cambria Enterprises, Inc. ("Cambria") is a corporation with headquarters in Minnesota in the business of manufacturing quartz countertops. Cambria has offices in Illinois and its products regularly reach consumers in all or most parts of Illinois, including Cook County. Defendant Cambria Fabshop-Chicago, Inc. ("Cambria Fabshop") is also a Minnesota corporation, on information and belief is a subsidiary of Cambria, has offices in Illinois, and is in the business of fabricating quartz surfaces. Cambria apparently conducts business in Illinois

1

through Cambria FabShop-Chicago, as Cambria is not registered with the Illinois Secretary of State to do business in Illinois.

3.  On or about January 1, 2006, Cambria entered into a purported non-competition/ confidentiality agreement with the plaintiff. Plaintiff had no employment relationship with defendant before signing the agreement, and defendant insisted that she sign the agreement in order to be hired. Attached hereto is the non-competition/confidentiality agreement as Exhibit A, the affidavit of plaintiff as Exhibit B, the affidavit of Gary Linze, President of Surface Solutions, as Exhibit C, the threat to sue letter from Cambria to Plaintiff as Exhibit D, the threat to sue letter from Cambria to Surface Solutions as Exhibit E, and the letter from Cambria to Surface Solutions welcoming it as a "business partner" as Exhibit F.

4.  The agreement states that, as purported consideration for the agreement, plaintiff was to be given an at-will employee job offer only, and the agreement contained no job description, no job title, no job responsibilities, nor any terms of compensation or benefits which plaintiff would enjoy during an employment with Cambria if she were hired. See Exhibit "A" at Recitals, par. F and par. 1.

5.  The agreement concerned the subject matter of post-employment noncompetition, non-solicitation, a presumption that any developments made during employment and for six months thereafter became the property of Cambria and the non-disclosure of any confidential information or trade secrets which plaintiff might become exposed to at Cambria, and provided that it was entered into by Cambria, its subsidiaries and "any affiliate" of Cambria's as the employer, on the one hand, and plaintiff on the other hand. See Exhibit "A" at page 1 (Introduction). Plaintiff worked out of the Cambria Fabshop Illinois location, and her duties included meeting with and educating dealers as well as partners of Cambria, in the value and

2

benefit of Cambria products.

6. On or about March 11, 2008, plaintiff gave oral notice of her resignation to Cambria and on March 14, 2008 was told by her district manager, Patrick Simonett, that she would remain on the payroll for two weeks but would have no duties to perform. Mr. Simonett took back from plaintiff all her Cambria marketing materials as well as her employee handbook. Plaintiff then prepared to take on new employment with Surface Solutions, Inc., (hereinafter "Surface" or "Surface Solutions"), an Illinois corporation engaged in the fabrication of countertops and located in St. Charles, Illinois.

7. Surface Solutions had been a business partner of Cambria's during plaintiff's employment with Cambria. Surface Solutions is not a manufacturer of quartz countertops, but rather is engaged in fabricating such items. Under its agreement with Cambria, Surface would sell Cambria product to the mutual benefit and profit of the companies. But Surface's sales were only to dealers and not to the endline consumer. The endline consumer was the customer of the dealer.

8. On March 31, 2008, plaintiff began her employment with Surface. On April 4, 2008, a Cambria representative, Patrick Simonett, after asking Surface whether it had hired plaintiff, and immediately after being told she had been hired, verbally informed Surface that it was terminating Surface's business partner status. The effect of this action on Cambria's part was to end Surface's affiliation with Cambria and to place plaintiff in the apparent position of being in violation of her non-compete/confidentiality agreement with Cambria because Surface would no longer be an "affiliate" of Cambria. See Exhibit C, para. 2, 3, and 11, and Exhibit F.

9. Next, on April 10, 2008, Cambria wrote to both plaintiff and Surface, claiming that plaintiff was prohibited from working for Surface due to the terms of Exhibit "A," that Surface

3

was interfering with Exhibit "A," and threatening to sue both plaintiff and Surface if plaintiff was solicited or hired by Surface and, if already hired, if Surface did not "correct" its alleged violation in hiring plaintiff, presumably by firing plaintiff. See Exhibits D and E.

10.  Plaintiff's employment with Surface was to promote and sell Cambria products, and plaintiff understood that, based upon the terms of Exhibit "A" and based upon her discussions with Cambria and/or Cambria Fabshop, working in such a capacity for Surface was not in violation of Exhibit "A." See Exhibit B, para. 7, 10, 13, and 14.

### NEED FOR TEMPORARY RESTRAINING ORDER

11.  Cambria's actions have caused and forced Surface and plaintiff to not perform any work because any work plaintiff might do while in Surface's employ (now that she cannot promote Cambria products) could be a violation of Exhibit A. Plaintiff is losing pay, and her ability to earn a living is in jeopardy. On April 30, 2008, plaintiff's salary was cut in half since, as she was told by Surface Solutions president Gary Linze, Surface Solutions cannot afford to pay her full salary during this time since she is unable to perform her job duties of promoting Cambria products — a situation that was caused by Cambria's termination of Surface's business partnership as a CIA with Cambria. This drastic reduction in plaintiff's salary is causing her imminent and irreparable harm, for her livelihood is dependant upon her salary.

12.  Exhibit "A" is unenforceable given, *inter alia*, the lack of consideration supporting it, the fact that it violates public policy, and that fact that even if it were enforceable, plaintiff is not breaching any obligations thereunder and must be so interpreted.

13.  Absent the immediate injunctive relief of a temporary restraining order, plaintiff will be irreparably damaged, have no adequate remedy at law for the harm Cambria is causing her, and will be deprived of her livelihood.

4

status quo and Cambria will continue in its operations until the court can hear and decide plaintiff's concurrently-filed motion for preliminary and permanent injunction and action for declaratory relief. Moreover, if the temporary restraining order is entered, Cambria not be harmed but will benefit since plaintiff's work activities will result in the sale of its products. Further, the likelihood of success on the merits for plaintiff is manifest as shown in the foregoing Exhibit A, the Agreement, which does not prohibit later employment with an "affiliate," which are stated in the agreement to be an "employer," or it is at least ambiguous and there was a lack of consideration. The public interest would not be affected by a temporary restraining order.

**WHEREFORE,** plaintiffs respectfully request that this Honorable Court:

A.    enter an order temporarily restraining and prohibiting Cambria from interfering with plaintiff's employment with Surface, including prohibiting Cambria claiming to plaintiff, Surface or others that plaintiff is in violation of Exhibit "A", so that plaintiff can perform the job for which she was hired;

B.    hold a hearing on plaintiff's motion for a preliminary injunction and enter an order enjoining Cambria from such interference and attempt to enforce Exhibit "A"; and

C.    accord such other relief to plaintiff is just and proper.


Respectfully Submitted,


_s/   Michael E. Lavelle_____
Michael E. Lavelle
Counsel for the plaintiff

Lavelle Law Group, LLC
Michael E. Lavelle, #55311
Kevin E. Bry, #18587
218 N. Jefferson St., Suite 203
Chicago, IL 60661
(312) 559-0600

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this ___7th___ day of ___May___, 2008.

Pam VanDeursen

## CONFIDENTIALITY AND NONCOMPETE AGREEMENT

This Confidentiality and Non-Compete Agreement is entered into as of January 1, 2006 between Cambria Enterprises, Inc., a Minnesota corporation located at 704 North Main Street in LeSueur, MN 56058, and its subsidiaries and any affiliate thereof (collectively, "Employer"), and Pamela Lynne VanDeursen who resides at PO Box 270, Wayne IL. 60184 (Employee).

### RECITALS:

A.    Employer is engaged in the manufacture and sale of quartz surfaces.

B.    Employee acknowledges that he/she will be employed in a position of trust and confidence and will have access to and will become familiar with the products, methods, technology, services and procedures used by Employer.

C.    Employee acknowledges that Employer has expended significant time and money on promotion, advertising and the development of goodwill and a sound business reputation. Employer has developed a list of customers and spent time and resources to learn the customers' needs for Employer's services and products. Employer also has entered into business relationships designed to discover likely future customers. All of the foregoing are valuable, special and unique assets of Employer's business. Employee acknowledges that the Employer's customer lists, including future changes to the customer lists, are confidential information which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

D.    Employee acknowledges that Employer has expended significant time and money on technology, research, and development. Employer has developed products, processes, technologies and services, which are valuable, special and unique assets of Employer's business. Employee acknowledges that the products, processes, technologies and services, including future changes thereto, are confidential information, which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

E.    Employee recognizes that the disclosure to or use by third parties of any of the Employer's confidential or proprietary information, trade secrets, or Employee's unauthorized use of such information would seriously harm Employer's business and cause monetary loss that would be difficult, if not impossible to measure.

F.    Employee wishes to enter into a new employment relationship with Employer whereby he/she receives the independent consideration offered in this Agreement and whereby he/she receives access to confidential information and existing and prospective customers.

NOW, THEREFORE, the parties hereby agree as follows:

1.    Independent Consideration. Employee acknowledges that Employer's offer of at-will employment was expressly conditioned upon Employee's acceptance of the terms of this Agreement. Employee enters into this Agreement in consideration for Employer's offer of at-will employment and in consideration for the terms and conditions hereof.

2.    Definitions. The following terms as used herein shall have the following meanings:

a.    "Confidential Information" means any information which is proprietary or unique to Employer, including but not limited to, trade secret information, matters of a technical nature such as processes, devices, manufacturing equipment, techniques, data and formulas, test samples, specifications and characteristics of products planned or being developed, research subjects and results, marketing plans and strategies, operations, products, revenues, profits, sales, key personnel, customers, suppliers, pricing policies, any information concerning the business affairs and methods of Employer, which is not readily available to the public, and any information Employer has indicated is confidential.

b.    "Intellectual Property" means any idea, invention, improvement, discovery, process, design, computer program, user interface and related documentation or work of authorship relating to the existing or contemplated business or research of Employer or resulting from Employee's work for Employer, whether patentable,

**Exhibit A**

copyrightable or susceptible to other forms of protection, in any stage of development, and whether or not Employer uses, registers or markets the same.

      c.    "Intellectual Property Rights" means all intellectual property rights, including but not limited to, all patent, copyright, trademark, and trade secret rights recognized under state, federal or common law in the United States, foreign countries and all international conventions.

      3.    <u>Covenant to Protect Confidential Information</u>.  Employee acknowledges that in connection with employment by Employer, he/she will be brought into contact with Confidential Information. In consideration of the opportunity to receive Confidential Information, Employee covenants and agrees that:

      a.    He/she will not disclose to any person or entity any Confidential Information, either during or after the term of his/her employment, except to designated employees of Employer (only as such employees need such information and are designated by Employer as needing such information), and attorneys, accountants or other representatives of Employer as may be necessary or appropriate in the ordinary course of performing his/her duties as an Employee of Employer, or otherwise with Employer's express prior written consent.

      b.    He/she will not disclose or transfer any Confidential Information to any third party without the express prior written consent of Employer.

      c.    He/she will deliver to Employer promptly upon termination of his/her employment, or at any other time that Employer may so request, all memoranda, notes, records (including electronic data records), reports and other documents (and all copies thereof) relating to the Confidential Information which he/she may then possess or have within his/her control.

      4.    <u>Termination of Obligation of Confidentiality</u>.  The confidentiality obligations imposed by this Agreement shall cease to apply to Confidential Information (but not test samples) after the <u>earliest</u> of the date on which Employee provides Employer with written evidence clearly establishing that the Confidential Information which has been treated by Employer as Confidential Information: (i) was known to Employee before it was obtained from Employer; (ii) was publicly available on the date of first receipt from Employer; (iii) has become generally known to the public in the United States through no fault of Employee; (iv) has been disclosed to Employee free of any obligation of confidentiality by a third party who has the right to disclose the same and who did not derive the information from Employer; or (v) was independently developed by Employee without the use of Employer's Confidential Information.

      5.    <u>Obligations with respect to Developments</u>.  With respect to Developments made, created or conceived by Employee while employed by Employer, either independently or jointly with others, whether during Employer's normal working hours or thereafter, Employee acknowledges that such Developments and the Intellectual Property Rights thereto belong solely to Employer.  Until proven otherwise, any Development made or created by Employee within one (1) year after Employee's termination of employment with Employer shall be presumed to have been conceived by Employee during his/her employment with Employer. Accordingly, Employee shall therefore:

      a.    promptly and fully inform Employer in writing of Developments made, created or conceived during his/her term of employment or within one year thereafter;

      b.    assign (and Employee does hereby assign) to Employer all his/her ownership in and Intellectual Property Rights to such Developments; and

      c.    assist Employer as requested during and after his/her employment to evidence, perfect and enforce Employer's Intellectual Property Rights in and ownership of such Developments, by promptly executing and delivering to Employer (without charge to Employer but at the expense of Employer), the necessary written instruments, and by performing such other acts as may be necessary in the opinion of Employer so as to enable Employer to obtain and maintain Letters Patent or other Intellectual Property Rights in such Developments, and so as to vest the entire right and title thereto in Employer.

2

Notwithstanding anything herein to the contrary, the parties agree that the assignment provisions of this Agreement are written to be in accordance with and shall be interpreted consistent with Minnesota Statute Section 181.78, Subdivision 1, which states as follows:

> Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

6.     Agreement not to Compete. Employee hereby covenants and agrees with Employer and for the benefit of Employer, that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, on Employee's own behalf or on behalf of any third party, Employee will not perform, engage in or otherwise be involved in any activities in direct competition with the business of Employer, directly or indirectly, anywhere in the United States and in those foreign countries in which the Employer operates (the "Territory").

7.     Nonsolicitation; Nondisparagement. Employee acknowledges and agrees with Employer that during the course of Employee's employment with Employer, Employee has had and will continue to have the opportunity to develop relationships with existing employees, customers and other business associates of the Employer, which relationships constitute goodwill of Employer, and Employee acknowledges and agrees that Employer would be irreparably damaged if Employee were to take actions that would damage or misappropriate such goodwill. Employee accordingly covenants and agrees that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, Employee will not:

> a.     solicit, divert or hire away, or in any manner attempt to solicit, divert or hire away, directly or indirectly, on Employee's own behalf or on behalf of others, any employees of the Employer, or any persons who have been employees within six months, to any competitor of the Employer, or

> b.     directly or indirectly enter into, engage in, assist, give or lend funds to or otherwise finance, be employed by or consult with, or have a financial or other interest in, any business which competes with any of the Employer within the Territory, whether personally or as an independent contractor, agent, stockholder, partner or joint venturer for any other person, provided that the aggregate ownership by Employee of no more than two percent of the outstanding equity securities of any person, which securities are traded on a national or foreign securities exchange, quoted on the Nasdaq Stock Market or other automated quotation system shall not be deemed to be giving or lending funds to, otherwise financing or having a financial interest in a competitor, or

> c.     solicit any customer of any of the Employer (including any customer as of the date of termination, or any person that has contracted or been solicited by or referred to Employer for purposes of becoming a customer of the Employer, and whom it is reasonably expected will become a customer), to purchase or distribute information, products or services of or on behalf of Employee or such other person that are competitive with the information, products or services provided by the Employer, or

> d.     take any action that is reasonably likely to cause injury to the relationships between the Employer or any of its employees and any lessor, lessee, vendor, supplier, customer, distributor, employee, consultant or other business associate of any of the as such relationship relates to the business of Employer.

Employee understands that the foregoing restrictions may limit the Employee's ability to earn a livelihood in a business similar to the business of the Employer, but Employee nevertheless believes that Employee has received and will receive sufficient consideration and other benefits as an employee of Employer and as otherwise provided hereunder to clearly justify such restrictions which, in any event (given Employee's education, skills and ability), Employee does not believe would prevent him from otherwise earning a living.

3

8.    Stipulated Reasonableness.  Employee acknowledges that the nature of Employee's position, the period of time necessary to fill Employee's position in the event Employee's employment is terminated, the period of time necessary to allow customers of Employee's business to become familiar with Employee's replacement in the event Employee's employment is terminated, and the period of time necessary to obliterate the identification between Employer and Employee in the minds of Employer's customers, commands that the two (2) year non-competition period be imposed hereunder for the protection of Employer's investment in its business.  Employee further agrees that the restrictions contained in this Agreement shall apply no matter how or why his/her employment terminates and regardless of whether the termination is voluntary or involuntary.  Employee further agrees that the restrictions contained in this Agreement shall survive the termination of his/her employment.

9.    No Conflict.  Employee represents that he/she is not bound or restricted by a non-competition agreement, a confidentiality or non-disclosure agreement, or any other agreement with a former employer or other third party, which would conflict with this Agreement or Employee's employment with Employer.  Employee further agrees that he/she will not use any trade secrets or other intellectual property belonging to any third party while performing services for the Employer.

10.    Remedies.  In the event of the violation or threatened violation by Employee of any of the covenants contained in this Agreement, in addition to any other remedy available in law or in equity, Employer shall have (i) the right and remedy of specific enforcement, including injunctive relief, it being acknowledged and agreed that any such violation or threatened violation will cause irreparable injury to Employer, and that monetary damages will not provide an adequate remedy to Employer; and (ii) rights to any and all damages available as a matter of law, and costs and expenses incurred by Employer in pursuing its rights under this Agreement, including reasonable attorneys' fees and other litigation expenses.

11.    Severability.  Should any covenant, term or condition contained in this Agreement become or be declared invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court shall be requested to judicially modify such unenforceable provision consistent with the intent of this paragraph so that it shall be enforceable to the fullest extent possible.

12.    Choice of Law/Forum.  This Agreement shall be construed and determined according to the laws, jurisdiction and venue of the State of Minnesota, and any disputes arising out of this Agreement shall be determined in a Minnesota District Court.

13.    Amendments; Waivers.  This Agreement may be amended, modified, superseded or cancelled, and the terms or covenants waived, only by a written instrument executed by both of the parties hereto or, in the case of a waiver, by Employer.  The failure to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same.  No waiver of any term, whether by conduct or otherwise, shall be deemed to be a further or continuing waiver of any such breach, or a waiver of the breach of any other term contained in this Agreement.

14.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of Employer and its successors and assigns.

15.    Survival.  Notwithstanding any termination of Employee's employment, this Agreement shall survive.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the day and year first above written.

CAMBRIA ENTERPRISES, INC.

By _John N. Velgagh_

Its _Vice President_

EMPLOYEE

_Pamela L VanDeusen_

4

Rev. 4/23/08

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

PAM VanDEURSEN,                          )
                                         )
        Plaintiff,                       )
                                         )        No._____
                                         )
        vs.                              )
                                         )
CAMBRIA ENTERPRISES INC., a Minnesota    )
Corporation, and CAMBRIA FABSHOP -       )
CHICAGO INC., a Minnesota corporation,   )
                                         )
        Defendants.                      )

## AFFIDAVIT

I, Pam VanDeursen, being first duly sworn, do hereby state under oath that the following statements are true and correct based on my personal knowledge, information and belief, and that if called upon to testify, I would so state under oath:

1.      I am a former employee of Cambria Enterprises Inc., a Minnesota corporation, and/or Cambria FabShop - Chicago, Inc., a Minnesota corporation that is authorized to conduct business in the State of Illinois (hereafter collectively referred to as "Cambria"). Cambria is a manufacturer of natural quartz countertop products for home and commercial use.

2.      In November or December 2005, I was solicited by a Cambria supervisor, Mr. Scott Jenewein, to join the company as a marketing representative. I was informed by Mr. Jenewein during my job interview that I would be required to sign a covenant not to compete with Cambria for two years after the termination of my employment. The covenant itself expressly stated that I could not begin my employment unless I signed the agreement (see Exhibit ___, a copy of non-compete agreement), and I understood I had no choice but to sign the covenant and that I could not negotiate its terms if I wanted to work for Cambria.

3.      Cambria hired me as a marketing representative and assigned me to cover a territory encompassing about 18 counties in Illinois, running from Illinois Route 53 to the west almost to the Iowa border, south to Wilmington and including part of Cook County. My first day of working for Cambria was January 1, 2006, and my job duties included meeting with and educating kitchen and bath dealers in the building and remodeling industries about the value and benefits of Cambria quartz products. This included visiting Cambria business partners in my

Exhibit B

1

territory to promote Cambria products, attendance at various trade shows, and monitoring the sales and productivity of the Cambria business partners, known as "Cambria Installer Associates." As a marketing representative, I never dealt directly with consumers nor made any sales of the Cambria product. Rather, I worked directly with Cambria's business partners in the kitchen and bath retail market. The Cambria Installer Associates also sell surface products made by competing manufacturers, so it was my duty to promote sales of the Cambria products among these affiliates. However, I was not provided with an employment contract.

4.      I was quite successful in the performance of my job duties, and in January 2007 I received a $3,000 bonus pay raise due to my job performance.

5.      On February 28, 2008, I received a letter from my then district manager, Mr. Patrick Simonett, stating that I was being placed on probation for at least 30 days, that I was required to perform specific tasks in order to improve my productivity, and that I would receive performance reviews every two weeks to determine whether I had complied with my probation requirements. I viewed the allegations in the probationary letter as very picayunish, particularly considering that my performance was meeting, if not exceeding, the performances of other Cambria marketing reps. This caused me to believe that Cambria's management was planning to terminate my employment, and so I began seeking a new job elsewhere.

6.      About February 29, 2008, I contacted Mr. Gary Linze, the president of a fabricator-installer company and Cambria business partner in my territory named Surface Solutions Inc. I asked Mr. Linze whether he would be interested in hiring me as a Cambria products salesperson. This was strictly my idea and neither Mr. Linze nor any agent of Surface Solutions ever solicited me for employment. Surface Solutions' productivity had been about average for the length of time (12 months) that they partnered to sell Cambria products. I believed that it would be beneficial to both Surface Solutions, Cambria and myself if I were hired by Surface Solutions to promote and sell Cambria products. About a week later, Mr. Linze sent me a written job offer that I was quite happy to receive because I knew that Surface Solutions was affiliated with Cambria, that I would not violate my non-compete and confidentiality agreement by working for one of Cambria's business partners, and that I would not be forced to leave the countertop-surface industry. After discussions related to the job offer, I signed an employment contract with Surface Solutions on about March 18, 2008, with an agreement that I would be placed on the Surface Solutions' payroll as of March 31.

7.     On March 11, 2008, I gave Cambria an oral two-week notice of my resignation in a phone call with Mr. Simonett, my district manager. I told Mr. Simonett that I would be working for Surface Solutions as their sales person for only Cambria products. Mr. Simonett did not object to my future employment with Surface Solutions, nor did he ever mention my non-compete agreement with Cambria.

8.     On March 14, 2008, I met Mr. Simonett at a predetermined location and, at his request, I handed over to him Cambria materials and equipment, including a laptop computer with carrying case, a fax machine, a Blackberry PDA, product samples and other promotional materials, as well as my Cambria employee handbook, which he had *specifically* requested. I asked Mr. Simonett how I was supposed to work for the next two weeks without my equipment and supplies, and he told me that I would remain on the Cambria payroll for the next two weeks, but that I did not have to perform any of my job duties during that time.

9.     March 26, 2008, was my last day on the Cambria payroll. I was not offered and did not receive an exit interview even though it was company policy for departing employees to receive an exit interview.

10.     I signed my employment contract with Surface Solutions on about March 18, 2008, and went on the company payroll on March 31, but my first day working out of the Surface Solutions' office was Monday, April 7, 2008. Surface Solutions had been a Cambria Installer Associate ("CIA") and business partner of Cambria's since about March 19, 2007. Because Cambria does not sell directly to consumers, Cambria has established formal relationships with fabricators, designers and/or installers around the world (with about six CIAs in the Chicago area). These business partners are the only companies with the authority sell Cambria products to other dealers and to consumers. In order to become a CIA business partner, the fabricator/installer/dealer companies must participate in lengthy training programs conducted by Cambria to learn how best to promote and sell the products.

11.     When I arrived at Surface Solutions on April 7, I understood, after a conversation with Mr. Linze, that Mr. Linze had been visited by Mr. Simonett the previous Friday, April 4, that Mr. Simonett had terminated the CIA business partnership with Cambria, that Surface Solutions could no longer offer or sell Cambria products and that the partnership was terminated because of Surface Solutions' low productivity. This was done in spite of the fact that Surface Solutions had secured about six new Cambria orders in the previous week and that other business partners in the Chicago area had even lower productivity but remained affiliated with Cambria.

3

This caused me to believe that Cambria was only terminating the partnership because I had started working for Surface Solutions, notwithstanding the fact that I was hired expressly to promote and sell only Cambria products.

12.    Mr. Linze asked me about my non-competition agreement with Cambria and I understood from this question that Mr. Simonett had raised my non-compete agreement in the April 4 meeting. I told Mr. Linze that I had a non-compete agreement with Cambria but that I had not discussed it with him because he hired me to promote and sell only Cambria products. I did not and do not agree that I violated my Cambria non-compete agreement by working for Surface Solutions.

13.    The purpose of my employment with Surface Solutions is to promote and sell Cambria products, thus acting in the best interests of Cambria and acting in compliance with the non-compete agreement.

14.    Furthermore, I never received or learned of any Cambria confidential information. Cambria keeps no confidential client lists — at least none of which I am aware — because it publishes on its Web site the names and addresses of its business partners and retail dealers, and it does not deal directly with the end consumers.


FURTHER AFFIANT SAYETH NOT.

Affiant,

_Pam VanDeursen_

Pam VanDeursen


State of Illinois          )
                           ) ss.
County of Cook             )

Sworn to, affirmed and subscribed before me by the above affiant this _24_ day of April, 2008.

_Adam W Lasker_

Notary Public

(se                    ADAM W LASKER
                         OFFICIAL SEAL
                    Notary Public, State of Illinois
                      My Commission Expires
                        September 06, 2010

4

Rev. 4/24/08

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

PAM VanDEURSEN,

    Plaintiff,

    vs.

CAMBRIA ENTERPRISES INC., a Minnesota
Corporation, and CAMBRIA FABSHOP -
CHICAGO INC., a Minnesota corporation,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

No._____

## AFFIDAVIT

I, Gary Linze, being first duly sworn, do hereby state under oath that the following statements are true and correct based on my personal knowledge, information and belief, and that if called upon to testify, I would so state under oath:

1. I am the president of Surface Solutions Inc., an Illinois corporation located at 1500 Foundry Park, Suite 1, in St. Charles, Illinois. Surface Solutions is a fabricator, designer and installer of countertop surfaces for residential and commercial use.

2. On or about March 19, 2007, Surface Solutions became official business partners with Cambria Enterprises Inc., a Minnesota corporation, and/or Cambria FabShop - Chicago, Inc., a Minnesota corporation that is authorized to conduct business in the State of Illinois (hereafter collectively referred to as "Cambria"). This partnership as a "Cambria Installer Associate" ("CIA") meant that Surface Solutions was given the authority to sell Cambria's unique quartz products to our clients. In order to obtain this partnership, my business partner Troy Elisoos and I had to attend meetings and training sessions at Cambria's Minnesota offices.

3. We had entered into an agreement with Cambria in order to become business partners. We do not have a copy of this written agreement because it was taken back by Cambria District Manager Patrick Simonett on April 4, 2008, when this agreement was terminated by Cambria as will be discussed below. (See Exhibit I, wherein Cambria refers to Surface Solutions as a business partner.)

4. Surface Solutions first became acquainted with Cambria in early 2006, when we received a phone call from a woman named Pam VanDeursen, who identified herself as a

Exhibit C

1

Cambria marketing representative. She said she was calling to see if Surface Solutions was interested in becoming a Cambria business partner. We engaged in conversations with Cambria employees, including Ms. VanDeursen, for about six months before we started our official training to become a Cambria Installer Associate.

5.    From the time we became business partners until the time Ms. VanDeursen left her employment with Cambria, we were in regular contact with Ms. VanDeursen about the promotion of Cambria products to dealers.

6.    As a Cambria business partner, we were permitted to offer this high-end product as an option for the designers, installers and consumers with whom we do business. We continue offering other brands of countertop surfaces, but we regard the Cambria product to be our highest-quality option. Cambria promotes itself as the only manufacturer of natural-quartz countertops in the U.S., which gives Surface Solutions the ability to promote and sell a unique product that can only be obtained from a small number of sources. In early 2008, I received a routine notice from Cambria that only five other CIAs operate in the entire Chicagoland area.

7.    Surface Solutions made approximately 25 to 30 sales of Cambria products, totaling about $82,000 in sales, during the nine-or-so months of partnership in the year 2007. In the first three-and-a-half months of 2008, Surface Solutions made approximately seven to ten Cambria sales totaling about $33,000.

8.    About February 29, 2008, I received another phone call from Ms. VanDeursen informing me that she was going to be leaving her job as a marketing representative for Cambria. She discussed with me that Cambria executives were interested in increasing Surface Solutions' productivity in selling the Cambria products. She then asked me whether my company would have any interest in hiring her as a Cambria sales representative. My partners and I determined that this would make a positive impact for our Cambria sales. In fact, there were several clients who said they were not happy with their current Cambria dealer and we had convinced them to stick with the Cambria products by working through Surface Solutions. For these and other reasons, my partners and I determined that hiring Ms. VanDeursen could be a very successful endeavor for our company (in addition to whatever advantages the increased sales would bring to Cambria), and we eventually made a written job offer to Ms. VanDeursen, which she accepted.

9.    On March 12, 2008, I had a conversation with Cambria executive Patrick Simonett. I told Mr. Simonett I was aware that Ms. VanDeursen was going to be leaving Cambria and that were hoping to hire her as our new Cambria sales representative. I told him that

2

Ms. VanDeursen would continue to promote Cambria sales for Surface Solutions and that we expected this to result in a healthy growth in sales of Cambria products. He expressed nothing negative about us hiring Ms. VanDeursen and he gave the impression that we would continue to grow our relationship as business partners.

10.    On March 18, 2008, I attended a meeting at the Cambria FabShop - Chicago fabrication facility in Waukegan, Illinois. Mr. Simonett also attended that meeting and we again discussed the fact that I was hoping to hire Ms. VanDeursen as a Cambria sales rep. His response again was quite positive. He also said he would come to Surface Solutions the following week to inform me as to who would be taking over Ms. VanDeursen's former role as the Cambria marketing executive for my region.

11.    About two weeks later, Mr. Simonett came to Surface Solutions' offices on Friday, April 4, 2008. I was expecting the purpose of this visit to be a discussion about the new Cambria marketing rep covering my region. However, one of the first things Mr. Simonett asked me was whether I hired Ms. VanDeursen. She had been hired and I let Mr. Simonett know this. Immediately following my response, and much to my surprise and disappointment, Mr. Simonett then told me that Cambria was terminating their partnership with us.

12.    Mr. Simonett stated that Surface Solutions had not been making adequate sales to continue the partnership. I told him that we had just secured six new sales within the previous week, and that our total Cambria sales for this first portion of 2008 totaled about $33,000, but this did not convince Mr. Simonett to continue the partnership. He told me that Cambria would still fulfill the orders for the six new sales, but that I would have to pre-pay Cambria for all the materials supplied for those six projects. This differed substantially from our business partner terms, where we were given 30 days following delivery of the product to make payments.

13.    Sue Gliszinski of Cambria then said in a letter that I, on behalf of Surface Solutions, had solicited Ms. VanDeursen to leave her employment with Cambria and to come work for us. This is completely false, as I had never even considered hiring Ms. VanDeursen until she called me on about February 29, 2008.

14.    Ms. Gliszinski also stated in the letter that Ms. VanDeursen was bound by a covenant not to compete with Cambria for two years after termination of her employment. Mr. Simonett also stated that it was a violation of that agreement for Ms. VanDeursen to work for Surface Solutions, which made no sense to me because Surface Solutions is (or was until April 4) a business partner with Cambria and Ms. VanDeursen was hired for the purpose of promoting

3

and selling Cambria products. With the addition of Ms. VanDeursen to our staff, Surface Solutions now had a full sales team dedicated to Cambria products and we were continuing to participate fully as Cambria's business partner in promoting their product.

15.    The termination of the business partnership just over a year after it began is a severe loss to my company in regards to the amount of time and energy we put into in attending the Cambria training sessions and in promoting their product line with our customers, and in the amount of money we spent on product samples for a product we are no longer authorized to sell. In the days since the termination of this partnership, I have been forced to turn away customers who want to purchase Cambria products and I have been forced to explain to my customers and competitors that my business is still sound, despite having been mysteriously dropped from the list of Cambria business partners. I believe the termination of this partnership reflects poorly on my company's public image and was and is very harmful to us. I also believe there to be no valid, equitable or justified reasons for this termination. Surface Solutions worked hard to generate approximately $115,000 in Cambria sales during our first 12 months as business partners, and we were just beginning to reap the benefits of our promotional work for Cambria products. Moreover, we anticipated even more Cambria product sales with Ms. VanDeursen on board as our sales representative, and we strongly expressed this to Mr. Simonett during every meeting we had with him.

16.    I have been informed and believe that several of the other five Cambria business partners in Illinois did not do much better than this sales amount during their first year or so, and that one current Cambria business partner of several years standing does even less than this.

FURTHER AFFIANT SAYETH NOT.

Affiant,

_____
Gary Linze

State of Illinois    )
                     ) ss.
County of Cook       )

Sworn to, affirmed and subscribed before me by the above affiant this 24 day of April, 2008.

_____
Notary Public                              (seal)

> "OFFICIAL SEAL"
> Patricia Jensen
> Notary Public, State of Illinois
> My Commission Expires 09-06-2008

4



# CAMBRIA®

Natural Quartz Surfaces™

April 10, 2008

Pam Van Deursen                    **VIA CERTIFIED MAIL,**
561 South Drive                    **RETURN RECEIPT REQUESTED**
South Elgin, IL 60177

Re:  Confidentiality and Non-Compete Agreement

Dear Ms. Van Deursen:

Attached please find a copy of the Confidentiality and Non-Compete Agreement
dated January 1, 2006 between you and Cambria.  Please note your ongoing
obligations under this Agreement, particularly with respect to your obligations of
non-compete, confidentiality and non-disclosure.

As a member of our team, you were privy to a substantial amount of Cambria's
confidential information, including, but not limited to: trade secret information,
matters of a technical nature such as processes, devices, manufacturing
equipment, techniques, data and formulas, test samples, specifications and
characteristics of products planned or being developed, research, marketing plans
and strategies, operations, products, revenues, profits, sales, customers, customer
lists, suppliers, pricing policies, employee lists and the like.

Cambria has reason to believe that you are contemplating or have accepted
employment with Surface Solutions, Inc., which Cambria considers a violation of
your agreement.

Breach of your agreement is a very serious matter. If you have or are
contemplating any breach, we will act swiftly and aggressively to enforce the
agreement.  You should also be aware that we have advised Surface Solutions of
your responsibilities, as they too have a responsibility not to induce you to violate
your agreement.

If you have any questions regarding your responsibilities under this agreement,
please feel free to contact me at 952-944-1676.

Sincerely,

Sue Gliszinski

Enc.

704 North Main Street, P.O. Box 69
Le Sueur, MN 56058
507-665-4555  1-866-CAMBRIA  Fax 507-665-3701
www.CambriaUSA.com

THE ONLY PRODUCER OF QUARTZ SURFACES IN THE UNITED STATES

**EXHIBIT D**



# CAMBRIA®

Natural Quartz Surfaces™

April 10, 2008

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND FAX

Surface Solutions, Inc.
Attn: Gary Linze and Troy Ellsoos
1500 Foundry Park, Suite #1
St. Charles, IL 60174

Re: Pam Van Deursen/Confidentiality and Non-Compete Agreement

Dear Mr. Linze and Troy Ellsoos:

It is my understanding that you have encouraged Ms. Van Deursen to leave her employment with Cambria in order to work for Surface Solutions, Inc., despite your knowledge that she has a non-compete/confidentiality agreement with Cambria.

This will confirm that Pam Van Deursen indeed has a written confidentiality and non-compete agreement with Cambria, a copy of which is enclosed. Among other things, this agreement includes a covenant not to compete that is in effect for two years after leaving Cambria's employ. In addition, the agreement also provides strict confidentiality and non-disclosure provisions to which Ms. Van Deursen must abide.

Ms. Van Deursen has confidential and proprietary information that belongs to Cambria. Cambria has reason to believe that she has accepted a job with your company, despite Cambria's representations to you and Ms. Van Deursen that we consider this a violation of the confidentiality and non-compete agreement.

If this information is correct, Ms. Van Deursen is in violation of her agreement. In addition, you are interfering with Cambria's contract with Ms. Van Deursen, and may be liable to Cambria for tortious interference with contract.

Please be advised that we insist that you and your representatives cease all unlawful solicitations immediately and retract any outstanding offer of employment to Ms. Van Deursen, or otherwise correct this situation. We must receive a response from you by April 20, 2008, or we will assume that you intend to proceed with your legal violations, despite your clear and obvious knowledge of the existence of this non-compete agreement and other trade secret/confidentiality issues.

704 North Main Street, P.O. Box 59
Le Sueur, MN 56058
507-665-4555  1-866-CAMBRIA  Fax 507-665-3701
www.CambriaUSA.com

**EXHIBIT E**

THE ONLY PRODUCER OF QUARTZ SURFACES IN THE UNITED STATES

Surface Solutions, Inc.
Page 2
April 10, 2008


Although Cambria would prefer to avoid litigation, be advised that we will pursue all legal rights and remedies if you do not correct this situation immediately.

I look forward to an immediate response.


Sincerely,

Sue Gliszinski
952-944-1676
Fax:  952-826-6223

Enc.



# CAMBRIA®
*Quality Quartz Surfaces®*

March 19, 2007

Gary Linze
Troy Ellsoos
Surface Solutions
1500 Foundry Park Ste. 1
St. Charles IL 60174

Dear Gary and Troy,

Welcome to the Cambria Team! Speaking on behalf of all of us at Cambria, we are excited to form this new partnership with Surface Solutions, and we expect great returns for both our companies in the near future and beyond.

Please find included with this letter your residential price list; the prices Surface Solutions pays Cambria for fabricated product. The price list is confidential, and is not to be distributed beyond necessary personnel at Surface Solutions.

The list covers all aspects of Cambria pricing, (and we ask that you do read the product disclaimers closely) but if you have any questions please contact me at 952-944-1676. Of course our Market Representative, Pam VanDeursen, is always available to answer any question you may have.

Again, it is great to have Surface Solutions on board as a Cambria Installer Associate. We look forward to a long and prosperous relationship.

Sincerely,

Arthur Hartman II
Director of Business Partner Services

**EXHIBIT F**

SALES & MARKETING
· 11000 West 78th Street, Suite 220  Eden Prairie, MN 55344
952-944-1676  1-866-CAMBRIA  Fax 952-944-7675
www.CambriaUSA.com

THE ONLY PRODUCER OF QUARTZ SURFACES IN THE UNITED STATES