**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PAM VANDEURSEN )
)
        Plaintiff, )
)
    v. )   Case No.
)
CAMBRIA ENTERPRISES, INC., a Minnesota )   (Removed from Circuit Court of Cook
corporation, CAMBRIA FABSHOP- )   County, Illinois, Case No. 08 CH 15281)
CHICAGO, INC., a Minnesota corporation, )
)
        Defendant. )
)

**NOTICE OF REMOVAL**

      Defendants, Cambria Enterprises, Inc., and Cambria FabShop-Chicago, Inc. (collectively

"Cambria"), by their attorneys and pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, respectfully

submit this Notice of Removal with regard to Case Number 08 CH 15281, originally filed in the

Circuit Court of Cook County, County Department, Chancery Division.  In support of their

Notice of Removal, Defendants state as follows:

**State Court Action**

      1.     On April 24, 2008, Pam VanDeursen ("VanDeursen") filed her "Complaint for

Injunctive and Declaratory Relief" in the Circuit Court of Cook County, County Department,

Chancery Division, Case Number 08 CH 15281, alleging causes of action for injunctive relief

(Count I) and declaratory judgment (Count II).  This dispute is predicated on the enforceability

of certain post-employment obligations contained in Plaintiff's Confidentiality and Noncompete

Agreement (the "Agreement") with Cambria.  A copy of Plaintiff's Complaint is attached hereto

as Exhibit A.

2.    Upon filing her action, Plaintiff filed a Motion for an Expedited Hearing for a Preliminary Injunction.  The state court has made no ruling on the motion.  A copy of Plaintiff's Motion for an Expedited Hearing for a Preliminary Injunction is attached hereto as Exhibit B.

3.    The attached Complaint and Motion for an Expedited Hearing for a Preliminary Injunction constitute all "process, pleadings, and orders" served upon Cambria in the state court action.  *See* 28 U.S.C. § 1446(a).

**Factual Bases for Removal**

4.    In her Complaint, Plaintiff alleges that she is a resident of Illinois.  (Ex. A at ¶ 1).

5.    Defendants are corporations organized and existing under the laws of the State of Minnesota with their principal places of business in Minnesota.

6.    Because Plaintiff is a citizen of Illinois and Defendants are citizens of Minnesota, there is diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332.

7.    The amount in controversy in this litigation exceeds the jurisdictional threshold amount of $75,000, exclusive of costs and interest.  Plaintiff's Complaint does not allege an express *ad damnum* for her claims for injunctive relief (Count I) and declaratory judgment (Count II).  However, when a plaintiff is seeking declaratory or injunctive relief, the removing defendant can also establish the amount in controversy by showing the value of the object of litigation.  *Countrywide Home Loans, Inc. v. Stewart Title Guar.Co.*, 2007 WL 906154, (E.D. Wis. 2007); *see also McCarty v. Amoco Pipeline Co.*, 595 F.2d 389 (7th Cir. 1979); *Rubel v. Pfizer Inc.*, 361 F.3d 1016 (7th Cir. 2004).

8.    Here, Plaintiff's Complaint seeks, *inter alia*, a declaration that certain provisions of her Agreement with Cambria are not enforceable and to enjoin Cambria from enforcing the Agreement against Plaintiff. (Ex. A at ¶¶ 17-20).

9.      In addition to the "Agreement not to Compete" provision, the Agreement with Cambria also contains certain non-solicitation and non-disclosure obligations in furtherance of Cambria's lawful efforts to protect its proprietary confidential information, trade secrets and customer relationships.  Plaintiff's Agreement with Cambria is attached to her Complaint as Exhibit A.

10.     Accordingly, the "object of litigation" at issue in Plaintiff's claim for declaratory judgment directly effects Cambria's ability to protect its confidential information, trade secrets and customer relationships and, if the agreement is determined to be unenforceable, could result in significant financial loss to Cambria.  *See* Affidavit of James Tucker, attached hereto as Exhibit C.

11.     Specifically, On December 7, 2005, Cambria offered Plaintiff a position as a Market Representative.  (*See* Plaintiff's Affidavit attached as Exhibit C to the Complaint).  That offer was made "contingent upon you signing the Confidentiality and Non-Compete Agreement that will be sent to you, [which] needs to be executed and returned to me by your first day of work."  The Agreement was sent to plaintiff, and she signed it effective January 1, 2006.

12.     From January 1, 2006 to March 13, 2008, Plaintiff worked for Cambria as one of three Market Representatives in Chicagoland.  As part of her duties and responsibilities, plaintiff was to recruit potential CIAs for Cambria in her territory.  Additionally, plaintiff was responsible for stimulating demand for CAMBRIA® products within her territory, by doing things such as attending trade shows and conferences and visiting CIA retail locations, developers, architects, builders, and contractors.

13.     Surface Solutions, Inc. ("Surface Solutions") was one of approximately 12 CIAs within plaintiff's territory, "core" or central Chicagoland.  Surface Solutions represented 15 or

more surface products in addition to CAMBRIA products — including competing quartz products from Zodiaq, Silestone, Ceasar Stone, and Technistone, which compete directly with CAMBRIA products.

14.      On or about March 13, 2008, plaintiff resigned from her employment with Cambria and advised Cambria that she may have an employment opportunity at Surface Solutions.

15.      In or about early 2008, Cambria made the decision to terminate Surface Solutions as a CIA.  Cambria had had ongoing problems with poor performance by Surface Solutions, and suspected that Surface Solutions was "flipping" customers, e.g., using CAMBRIA products as a loss leader to draw customers into their store, then making sales of competing products. VanDeursen knew of the decision to decertify Surface Solutions at least as early as February 20, 2008.

16.      On April 4, 2008, Cambria formally terminated its relationship with Surface Solutions for the above stated reasons.

17.      Cambria has since learned, from another CIA, that VanDeursen told him Cambria was experiencing production delays of up to six weeks - - a statement that is not only patently false, but potentially devastating to Cambria's business.  Specifically, in the construction and renovation business, builder/remodelers and property owners very often base their product decisions on availability.  A delay of more than three weeks would likely preclude a builder/remodeler or owner form selecting that product - - they will move on to a similar product that is readily available.  Because VanDeursen recently worked for Cambria, any statement by her about Cambria products and operations, even false or disparaging statements, may be given credibility, and one may never know how deep or widespread the damage will be.  Hence,

-4-

Cambria is exposed to irreparable harm through VanDeursen's apparent competitive activities, and her apparent "production delay" comment is a poignant example.

18.    Plaintiff's Complaint establishes that Plaintiff plans on commencing work in the same geographic area for a company (Surface Solutions) that provides products that directly compete with Cambria's products.

19.    As a result, Cambria is now faced with a disgruntled ex-employee, Pam VanDeursen, who is employed by a disgruntled ex-supplier, Surface Solutions, each of whom is positively incented to deflect sales away from CAMBRIA products toward competitors' products, and one of whom, VanDeursen, is possessed with detailed and intimate knowledge regarding the Defendants' business plans and strategies, customer information, and supplier information which could be used to assist her and Surface Solutions in deflecting sales away from CAMBRIA® products.  Moreover, Cambria has information that VanDeursen has already begun to spread damaging information about Cambria to the public.  The resultant financial loss to Cambria would be incalculable.  Moreover, Cambria's confidential and proprietary information is worth significantly more than $75,000.  (Ex. C, Tucker Aff. at ¶¶ 4-6).

20.    In addition, the potential financial loss to Plaintiff in itself exceeds $75,000.00 as Plaintiff was earning $63,000.00 in base salary from Cambria.  Pursuant to the Agreement, the term of the non-competition provision is for two years.  Presumably, Plaintiff has been offered as much or more to become employed by Surface Solutions.  As a result, the two years of salary total more than $75,000.00.

## Removal Is Proper In This Case

21.    Cambria may remove this action pursuant to 28 U.S.C. § 1441 because jurisdiction in this Court is proper.  Under 28 U.S.C. § 1332(a)(1), "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or

CH1 11467681.1

value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ." As explained above, there is diversity of citizenship in this case because the Plaintiff is a citizen of the State of Illinois and the Defendants are citizens of Minnesota. Also, the amount in controversy in this case exceeds $75,000.00, exclusive of interests and costs.

22.    This Notice of Removal is timely filed, within thirty (30) days of Defendatns receiving service on April 25, 2008. *See* 28 U.S.C. § 1446(b); Fed. R. Civ. P. 6.

23.    Cambria shall file a copy of this Notice of Removal with the Clerk of the Circuit Court of Cook County, to effectuate removal of this action to the United States District Court, pursuant to 29 U.S.C. § 1446(d).

WHEREFORE, Defendants respectfully requests that this Court accept this Notice of Removal and assume jurisdiction over this cause of action and issue such further orders and process as may be necessary in the course of litigation.

**DATED: April 28, 2008**                    Respectfully submitted,

CAMBRIA ENTERPRISES, INC., CAMBRIA FABSHOP –CHICAGO, INC.


By: s/Brian P. Roche
          One of Its Attorneys

-6-

Thomas J. Piskorski
Brian P. Roche
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

**Of Counsel:**
Gregory J. Stenmoe
Steven W. Wilson
Briggs and Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402,
(612) 977-8400


## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on May 9, 2008, **Defendants' Notice of**

**Removal with Amended Exhibit C** was electronically filed using the CM/ECF system which

will send notification of such filing to all attorneys of record who have registered for e-mail

delivery as listed below:


Michael E. Lavelle
Lavelle Law Group, LLC
218 North Jefferson Street, Suite 203
Chicago, IL  60661


s/Brian P. Roche
Brian P. Roche

-7-

# EXHIBIT A

STATE OF ILLINOIS )
                  ) SS
COUNTY OF C O O K )

FILED - 3

2008 APR 24  PM 3: 14

CIRCUIT COURT OF COOK
COOK COUNTY, ILLINOIS
CHANCERY DIV.

DOROTHY BROWN            CLERK

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

PAM VANDEURSEN                              )
                                           )
        Petitioner-Plaintiff,              )
                                           )          08 C H 15281
        v.                                 )
                                           )     No. _____
CAMBRIA ENTERPRISES, INC., a Minnesota     )
corporation, and CAMBRIA FABSHOP-CHICAGO, INC, )
a Minnesota corporation,                   )
                                           )
        Respondent-Defendants.             )

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

NOW COMES the plaintiff, by and through her attorneys, LAVELLE LAW GROUP

LLC, and for her complaint for injunctive and declaratory relief, states as follows:

### PARTIES AND BACKGROUND

1. Plaintiff Pam VanDeursen is an Illinois resident and former employee of defendant

Cambria Enterprises, Inc. (hereinafter generally "Cambria").

2. Defendant Cambria Enterprises, Inc. ("Cambria") is a corporation with headquarters

in Minnesota in the business of manufacturing quartz surfaces. Cambria has offices in Illinois

and its products regularly reach consumers in all or most parts of Illinois, including Cook

County. Defendant Cambria FabShop-Chicago, Inc. ("Cambria Fabshop") is also a Minnesota

corporation, on information and belief is a subsidiary of Cambria, has offices in Illinois, and is in

the business of fabricating quartz surfaces. Plaintiff is informed and believes that Cambria

Fabshop is a subsidiary because, although plaintiff was hired by Cambria, her job supervisor was

1

**EXHIBIT A**

provided by Cambria Fabshop.

3. On or about January 1, 2006, Cambria entered into a purported noncompetition/confidentiality agreement with plaintiff. Plaintiff had no employment relationship with defendant before signing the agreement, and defendant insisted that she sign the agreement in order to be hired.

4. The agreement, attached hereto and incorporated herein as Exhibit "A," stated that as purported consideration for the agreement, plaintiff was to be an at-will employee only and the agreement contained no description of the job responsibilities or terms of compensation or benefits which plaintiff would enjoy during her employ with Cambria. (See Exhibit "A" at Recitals, par. F and par. 1.) The agreement itself required that plaintiff sign it before she could be hired. (See Exhibit A, par 1.)

5. The agreement concerned, among other things, the subject matter of post-employment noncompetition and the confidentiality of information or trade secrets which plaintiff might become exposed to at Cambria, and provided that it was entered into by Cambria, its subsidiaries and "any affiliate" of Cambria's as the employer, on the one hand, and plaintiff on the other hand. See Exhibit "A" at page 1 (Introduction). Plaintiff worked at the Cambria Fabshop, Illinois location, and her duties included meeting with and educating dealers and business partners of Cambria, with regard to the value and benefit of Cambria products. (See Exhibit B, affidavit of plaintiff attached hereto and incorporated herein.)

6. On or about the second week of March 2008, plaintiff prepared to take on new employment with Surface Solutions, Inc., (hereinafter "Surface Solutions"), an Illinois corporation engaged in the fabrication of countertops.

7. Surface Solutions had been a partner of Cambria's during plaintiff's employment with

2

Cambria. Surface Solutions is not a manufacturer of quartz surfaces, but rather is engaged in fabricating and selling such items. Under its agreement with Cambria, Surface would sell Cambria product to the mutual benefit and profit of both companies. A copy of the written agreement is not now available to plaintiff because the copy Surface Solutions had was given over to Cambria Fabshop upon their demand for same on April 4, 2008. (See Exhibit C, affidavit of Gary Linze, president of Surface Solutions attached hereto and incorporated herein.)

8. On March 31, 2008, plaintiff began her employment with Surface. On April 4, 2008, a Cambria representative verbally informed Surface that it was terminating Surface's status partner status. The effect of this action on Cambria's part was to end Surface's affiliation with Cambria.

9. Additionally, on April 10, 2008, Cambria wrote to both plaintiff and Surface, claiming that plaintiff was prohibited from working for Surface due to the terms of Exhibit "A," that Surface was interfering with Exhibit "A," and threatening to sue both plaintiff and Surface if plaintiff was solicited or hired by it.

10. Plaintiff was hired by Surface to work upon sales of Cambria products, and she understood that based upon the terms of Exhibit "A" and based upon her discussions with Cambria and/or Cambria Fabshop personnel, that working in such a capacity for Surface was not in violation of Exhibit "A."

11. Because of Cambria's relationship with Surface at the time plaintiff was put on its payroll, Surface was an "affiliate" of Cambria and thus, by a term of Exhibit A, was also an "employer" of plaintiff. (See Exhibit A at introduction.)

<u>COUNT I—PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

12. Cambria's actions have caused and forced Surface to disallow plaintiff to begin her

duties and has caused Surface to remain unsure if plaintiff can work for it, and has hindered plaintiff in her ability to work for Surface and to know that she has a job and the ability to earn a living in her chosen field.

13. Exhibit "A" is unenforceable given, *inter alia*, the lack of consideration supporting it, the fact that it violates public policy, and the fact that even if it were enforceable, plaintiff is not breaching any obligations thereunder and must be so interpreted.

14. Plaintiff has requested of Cambria that it cease and desist interfering with her current employment, but Cambria has failed to do so and indicated they will continue to do so and/or to sue plaintiff and her current employer.

15. Plaintiff's right to employment without interference by her former employer is manifest and absent an award of preliminary and permanent injunctive relief, plaintiff will be irreparably harmed as she will lose not only her employment with Solutions but her ability to support herself will be significantly impaired, and she has no adequate remedy at law for her injuries.

16. No harm will befall defendant by the issue of injunctive relief as Cambria is still operating, and expeditious injunctive and declaratory relief herein is available while the status quo is maintained; the status quo being that plaintiff was employed by Surface and that she will sells Cambria products.

WHEREFORE, plaintiff respectfully requests that this Honorable Court:

A. hold an expedited hearing on her right to a preliminary injunction and limited discovery necessary for plaintiff to prepare for same;

B. enter an order enjoining and prohibiting Cambria from interfering with plaintiff's employment with Surface, including prohibiting Cambria from threatening to sue plaintiff or Surface or from claiming to plaintiff, Surface or others that plaintiff is in violation of Exhibit "A", and restoring Surface the right

4

to sell Cambria products under the terms of its business partnership agreement with Cambria so that plaintiff can perform the job for which she was hired;

C. thereafter to conduct a full hearing on the merits and enter an order permanently enjoining Cambria from such interference and attempt to enforce Exhibit "A";

D. restoring the right of Surface to sell Cambria products under the terms of its business partner agreement with Cambria; and

E. accord such other relief to petitioners as is just and proper.

<u>COUNT II – DECLARATORY RELIEF</u>

17. Plaintiff incorporates and realleges paragraphs 1-16 as paragraph 17 of this Count II.

18. 735 ILCS 5/2-701 provides generally that a declaration of rights, including those arising from construction of contracts, may be made and such shall have the binding effect of a final judgment.

19. Cambria has taken the position that Exhibit "A" prohibits plaintiff from working for Surface and that her conduct in doing so, while plaintiff asserts that she is not prohibited from doing so under the terms of the Agreement, which if so interpreted is against public policy. Moreover, Cambria has willfully placed plaintiff in the apparent position of violating Exhibit A by, after plaintiff was hired by Surface Solutions, terminating the business partner/affiliate relationship it had with Surface Solutions.

20. Plaintiff has a clear interest in the instant controversy, which is ripe and appropriate for review by way of the declaratory judgment mechanism.

WHEREFORE, plaintiff prays that:

A. This Court make a determination that the instant matter may proceed as a declaratory    action and that the Court enter a declaratory judgment in plaintiffs' favor under 735 ILCS 5/2-701, declaring the right of plaintiff to lawfully continue in her employment with Surface and that such employment is not prohibited by Exhibit "A" or otherwise;

B. Require Cambria to restore the effectiveness of the business partner agreement between Cambria and Surface Solutions so that plaintiff can perform the job for which she was hired; and

C. That this Court grant such other relief as is just and proper.

Respectfully Submitted,

Michael E. Lavelle
Counsel for the plaintiff

Lavelle Law Group, LLC.
Michael E. Lavelle, #55311
Adam W. Lasker, #
218 N. Jefferson St., Suite 203
Chicago, IL 60661
(312) 559-0600

Of Counsel:
Kevin E. Bry, #18587
218 N. Jefferson St., Suite 203
Chicago, IL 60661
(312) 749-7400

6

## Verification by Certification

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the foregoing instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that she verily believes the same to be true.

Pam VanDeursen

7

## CONFIDENTIALITY AND NONCOMPETE AGREEMENT

This Confidentiality and Non-Compete Agreement is entered into as of January 1, 2006 between Cambria Enterprises, Inc., a Minnesota corporation located at 704 North Main Street in LeSueur, MN 56058, and its subsidiaries and any affiliate thereof (collectively, "Employer"), and Pamela Lynne VanDeurzen who resides at PO Box 270, Wayne IL 60184 (Employee).

RECITALS:

A.    Employer is engaged in the manufacture and sale of quartz surfaces.

B.    Employee acknowledges that he/she will be employed in a position of trust and confidence and will have access to and will become familiar with the products, methods, technology, services and procedures used by Employer.

C.    Employee acknowledges that Employer has expended significant time and money on promotion, advertising and the development of goodwill and a sound business reputation. Employer has developed a list of customers and spent time and resources to learn the customers' needs for Employer's services and products. Employer also has entered into business relationships designed to discover likely future customers. All of the foregoing are valuable, special and unique assets of Employer's business. Employee acknowledges that the Employer's customer lists, including future changes to the customer lists, are confidential information which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

D.    Employee acknowledges that Employer has expended significant time and money on technology, research, and development. Employer has developed products, processes, technologies and services, which are valuable, special and unique assets of Employer's business. Employee acknowledges that the products, processes, technologies and services, including future changes thereto, are confidential information, which should not be disclosed to persons outside of Employer's organization or used by Employee for his/her own benefit or the benefit of other persons.

E.    Employee recognizes that the disclosure to or use by third parties of any of the Employer's confidential or proprietary information, trade secrets or Employee's unauthorized use of such information would seriously harm Employer's business and cause monetary loss that would be difficult, if not impossible to measure.

F.    Employee wishes to enter into a new employment relationship with Employer whereby he/she receives the independent consideration offered in this Agreement and whereby he/she receives access to confidential information and existing and prospective customers.

NOW, THEREFORE, the parties hereby agree as follows:

1.    Independent Consideration.  Employee acknowledges that Employer's offer of at-will employment was expressly conditioned upon Employer's acceptance of the terms of this Agreement. Employee enters into this Agreement in consideration for Employer's offer of at-will employment and in consideration for the terms and conditions hereof.

2.    Definitions.  The following terms as used herein shall have the following meanings:

a.    "Confidential Information" means any information which is proprietary or unique to Employer, including but not limited to, trade secret information, matters of a technical nature such as processes, devices, manufacturing equipment, techniques, data and formulas, test samples, specifications and characteristics of products planned or being developed, research subjects and results, marketing plans and strategies, operations, products, revenues, profits, sales, key personnel, customers, suppliers, pricing policies, any information concerning the business affairs and methods of Employer, which is not readily available to the public, and any information Employer has indicated is confidential.

b.    "Intellectual Property" means any idea, invention, improvement, discovery, process, design, computer program, user interface and related documentation or work of authorship relating to the existing or contemplated business or research of Employer or resulting from Employee's work for Employer, whether patentable,

**Exhibit A**

copyrightable or susceptible to other forms of protection, in any stage of development, and whether or not Employer uses, registers or markets the same.

　　c.　　"Intellectual Property Rights" means all intellectual property rights, including but not limited to, all patent, copyright, trademark, and trade secret rights recognized under state, federal or common law in the United States, foreign countries and all international conventions.

3.　　Covenant to Protect Confidential Information. Employee acknowledges that in connection with employment by Employer, he/she will be brought into contact with Confidential Information. In consideration of the opportunity to receive Confidential Information, Employee covenants and agrees that:

　　a.　　He/she will not disclose to any person or entity any Confidential Information, either during or after the term of his/her employment, except to designated employees of Employer (only as such employees need such information and are designated by Employer as needing such information) and attorneys, accountants or other representatives of Employer as may be necessary or appropriate in the ordinary course of performing his/her duties as an Employee of Employer, or otherwise with Employer's express prior written consent.

　　b.　　He/she will not disclose or transfer any Confidential Information to any third party without the express prior written consent of Employer.

　　c.　　He/she will deliver to Employer promptly upon termination of his/her employment, or at any other time that Employer may so request, all memoranda, notes, records (including electronic data records), reports and other documents (and all copies thereof) relating to the Confidential Information which he/she may then possess or have within his/her control.

4.　　Termination of Obligation of Confidentiality. The confidentiality obligations imposed by this Agreement shall cease to apply to Confidential Information (but not test samples) after the earliest of the date on which Employee provides Employer with written evidence clearly establishing that the Confidential Information which has been treated by Employer as Confidential Information: (i) was known to Employee before it was obtained from Employer, (ii) was publicly available as of the date of first receipt from Employer, (iii) has become generally known in the public in the United States through no fault of Employee, (iv) has been disclosed to Employer free of any obligation of confidentiality by a third party who has the right to disclose the same and who did not derive the information from Employer, or (v) was independently developed by Employee without the use of Employer's Confidential Information.

5.　　Obligations with respect to Developments. With respect to Developments made, created or conceived by Employee while employed by Employer, either independently or jointly with others, whether during Employer's normal working hours or thereafter, Employee acknowledges that such Developments and the Intellectual Property Rights thereto belong solely to Employer. Until proven otherwise, any Development made or created by Employee within one (1) year after Employee's termination of employment with Employer shall be presumed to have been conceived by Employee during his/her employment with Employer. Accordingly, Employee shall therefore:

　　a.　　promptly and fully inform Employer in writing of Developments made, created or conceived during his/her term of employment or within one year thereafter;

　　b.　　assign (and Employee does hereby assign) to Employer all his/her ownership in and Intellectual Property Rights in such Developments; and

　　c.　　assist Employee as requested during and after his/her employment to evidence, perfect and enforce Employer's Intellectual Property Rights in and ownership of such Developments, by promptly executing and delivering to Employee (without charge to Employee but at the expense of Employer) the necessary written instruments; and by performing such other acts as may be necessary in the opinion of Employer so as to enable Employer to obtain and maintain Letters Patent or other Intellectual Property Rights in such Developments, and so as to vest the entire right and title thereto in Employer.

Notwithstanding anything herein to the contrary, the parties agree that the assignment provisions of this Agreement are written to be in accordance with and shall be interpreted consistent with Minnesota Statute Section 181.78, Subdivision 1, which states as follows:

Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer, shall not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer, or (b) to the employer's actual or demonstrably anticipated research, or development; or (2) which does not result from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

6.    **Agreement not to Compete.** Employee hereby covenants and agrees with Employer and for the benefit of Employer, that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, on Employee's own behalf or on behalf of any third party, Employee will not perform, engage in or otherwise be involved in any activities in direct competing with the business of Employer, directly or indirectly, anywhere in the United States and in those foreign countries in which the Employer operates (the "Territory").

7.    **Nonsolicitation; Nondisparagement.** Employee acknowledges and agrees with Employer that during the course of Employee's employment with Employer, Employee has had and will continue to have the opportunity to develop relationships with existing employees, customers and other business associates of the Employer, which relationships constitute goodwill of Employer, and Employee acknowledges and agrees that Employer would be irreparably damaged if Employee were to take actions that would damage or misappropriate such goodwill. Employee accordingly covenants and agrees that from the date hereof until two (2) years following termination of employment with Employer for any reason whatsoever, Employee will not:

a.    solicit, divert or hire away, or in any manner attempt to solicit, divert or hire away, directly or indirectly, on Employee's own behalf or on behalf of others, any employees of the Employer, or any persons who have been employees within six months, to any competitor of the Employer; or

b.    directly or indirectly enter into, engage in, assist, give or lend funds to or otherwise finance, be employed by or consult with, or have a financial or other interest in, any business which competes with any of the Employer within the Territory, whether principally or as an independent contractor, agent, stockholder, partner or joint venturer for any other person, provided that the aggregate ownership by Employee of no more than two percent of the outstanding equity securities of any person, which securities are traded on a national or foreign securities exchange, quoted on the Nasdaq Stock Market or other automated quotation system shall not be deemed to be giving or lending funds to, otherwise financing or having a financial interest in a competitor; or

c.    solicit any customer of any of the Employer (including any customer as of the date of termination, or any person that has contracted or been solicited by or referred to Employer for purpose of becoming a customer of the Employer, and whom it is reasonably expected will become a customer), to purchase or distribute information, products or services of or on behalf of Employee, or such other person that are competitive with the information, products or services provided by the Employer; or

d.    take any action that is reasonably likely to cause injury to the relationship between the Employer or any of its employees and any lessor, lessee, vendor, supplier, customer, distributor, employee, consultant or other business associate of any of the as such relationship relates to the business of Employer.

Employee understands that the foregoing restrictions may limit the Employee's ability to earn a livelihood in a business similar to the business of the Employer, but Employee nevertheless believes that Employee has received and will receive sufficient consideration and other benefits as an employee of Employer and as otherwise provided hereunder to clearly justify such restrictions which, in any event (given Employee's education, skills and ability), Employee does not believe would prevent him from otherwise earning a living.

3

8. **Stipulated Reasonableness.** Employee acknowledges that the nature of Employee's position, the period of time necessary to fill Employee's position in the event Employee's employment is terminated, the period of time necessary to allow customers of Employee's business to become familiar with Employee's replacement in the event Employee's employment is terminated, and the period of time necessary to dissipate the goodwill between Employer and Employee on behalf of Employer's customers, commends that the two (2) year non-competition period be imposed hereunder for the protection of Employer's investment in its business. Employee further agrees that the restrictions contained in this Agreement shall apply no matter how or why his/her employment terminates and regardless of whether the termination is voluntary or involuntary. Employee further agrees that the restrictions contained in this Agreement shall survive the termination of his/her employment.

9. **No Conflict.** Employee represents that he/she is not bound or restricted by a non-competition agreement, a confidentiality or non-disclosure agreement, or any other agreement with a former employer or other third party, which would conflict with this Agreement or Employee's employment with Employer. Employee further agrees that he/she will not use any trade secrets or other intellectual property belonging to any third party while performing services for the Employer.

10. **Remedies.** In the event of the violation or threatened violation by Employee of any of the covenants contained in this Agreement, in addition to any other remedy available at law or in equity, Employer shall have (i) the right and remedy of specific enforcement, including injunctive relief, it being acknowledged and agreed that any such violation or threatened violation will cause irreparable injury to Employer, and that monetary damages will not provide an adequate remedy to Employer, and (ii) rights to any and all damages available at a matter of law, and costs and expenses incurred by Employer in pursuing its rights under this Agreement, including reasonable attorneys' fees and other litigation expenses.

11. **Severability.** Should any covenant, term or condition contained in this Agreement become or be declared invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court shall be requested to judicially modify such unenforceable provision consistent with the intent of this paragraph so that it shall be enforceable to the fullest extent possible.

12. **Choice of Law/Forum.** This Agreement shall be construed and interpreted according to the laws, jurisdiction and venue of the State of Minnesota, and any disputes arising out of this Agreement shall be determined in a Minnesota District Court.

13. **Amendment; Waiver.** This Agreement may be amended, modified, superseded or cancelled, and the terms or covenants waived, only by a written instrument executed by both of the parties hereto or, in the case of a waiver, by Employer. The failure to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver of any term, whether by conduct or otherwise, shall be deemed to be a further or continuing waiver of any such breach, or a waiver of the breach of any other term contained in this Agreement.

14. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Employer and its successors and assigns.

15. **Survival.** Notwithstanding any termination of Employee's employment, this Agreement shall survive.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the day and year first above written.

CAMBRIA ENTERPRISES, INC.                    EMPLOYEE:

By _John N. Vagnild_                         _Cambria L. VanDaven_

Its _Vice President_

Rev. 4/23/08

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| PAM VanDEURSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No._____ |
| | ) | |
| CAMBRIA ENTERPRISES INC., a Minnesota | ) | |
| Corporation, and CAMBRIA FABSHOP - | ) | |
| CHICAGO INC., a Minnesota corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT

I, Pam VanDeursen, being first duly sworn, do hereby state under oath that the following statements are true and correct based on my personal knowledge, information and belief, and that if called upon to testify, I would so state under oath:

1.      I am a former employee of Cambria Enterprises Inc., a Minnesota corporation, and/or Cambria FabShop - Chicago, Inc., a Minnesota corporation that is authorized to conduct business in the State of Illinois (hereafter collectively referred to as "Cambria"). Cambria is a manufacturer of natural quartz countertop products for home and commercial use.

2.      In November or December 2005, I was solicited by a Cambria supervisor, Mr. Scott Jenewein, to join the company as a marketing representative. I was informed by Mr. Jenewein during my job interview that I would be required to sign a covenant not to compete with Cambria for two years after the termination of my employment. The covenant itself expressly stated that I could not begin my employment unless I signed the agreement (see Exhibit _____, a copy of non-compete agreement), and I understood I had no choice but to sign the covenant and that I could not negotiate its terms if I wanted to work for Cambria.

3.      Cambria hired me as a marketing representative and assigned me to cover a territory encompassing about 18 counties in Illinois, running from Illinois Route 53 to the west almost to the Iowa border, south to Wilmington and including part of Cook County. My first day of working for Cambria was January 1, 2006, and my job duties included meeting with and educating kitchen and bath dealers in the building and remodeling industries about the value and benefits of Cambria quartz products. This included visiting Cambria business partners in my

**Exhibit B**

1

territory to promote Cambria products, attendance at various trade shows, and monitoring the sales and productivity of the Cambria business partners, known as "Cambria Installer Associates." As a marketing representative, I never dealt directly with consumers nor made any sales of the Cambria product. Rather, I worked directly with Cambria's business partners in the kitchen and bath retail market. The Cambria Installer Associates also sell surface products made by competing manufacturers, so it was my duty to promote sales of the Cambria products among these affiliates. However, I was not provided with an employment contract.

4.      I was quite successful in the performance of my job duties, and in January 2007 I received a $3,000 bonus pay raise due to my job performance.

5.      On February 28, 2008, I received a letter from my then district manager, Mr. Patrick Simonett, stating that I was being placed on probation for at least 30 days, that I was required to perform specific tasks in order to improve my productivity, and that I would receive performance reviews every two weeks to determine whether I had complied with my probation requirements. I viewed the allegations in the probationary letter as very picayunish, particularly considering that my performance was meeting, if not exceeding, the performances of other Cambria marketing reps. This caused me to believe that Cambria's management was planning to terminate my employment, and so I began seeking a new job elsewhere.

6.      About February 29, 2008, I contacted Mr. Gary Linze, the president of a fabricator-installer company and Cambria business partner in my territory named Surface Solutions Inc. I asked Mr. Linze whether he would be interested in hiring me as a Cambria products salesperson. This was strictly my idea and neither Mr. Linze nor any agent of Surface Solutions ever solicited me for employment. Surface Solutions' productivity had been about average for the length of time (12 months) that they partnered to sell Cambria products. I believed that it would be beneficial to both Surface Solutions, Cambria and myself if I were hired by Surface Solutions to promote and sell Cambria products. About a week later, Mr. Linze sent me a written job offer that I was quite happy to receive because I knew that Surface Solutions was affiliated with Cambria, that I would not violate my non-compete and confidentiality agreement by working for one of Cambria's business partners, and that I would not be forced to leave the countertop-surface industry. After discussions related to the job offer, I signed an employment contract with Surface Solutions on about March 18, 2008, with an agreement that I would be placed on the Surface Solutions' payroll as of March 31.

2

7.     On March 11, 2008, I gave Cambria an oral two-week notice of my resignation in a phone call with Mr. Simonett, my district manager. I told Mr. Simonett that I would be working for Surface Solutions as their sales person for only Cambria products. Mr. Simonett did not object to my future employment with Surface Solutions, nor did he ever mention my non-compete agreement with Cambria.

8.     On March 14, 2008, I met Mr. Simonett at a predetermined location and, at his request, I handed over to him Cambria materials and equipment, including a laptop computer with carrying case, a fax machine, a Blackberry PDA, product samples and other promotional materials, as well as my Cambria employee handbook, which he had *specifically* requested. I asked Mr. Simonett how I was supposed to work for the next two weeks without my equipment and supplies, and he told me that I would remain on the Cambria payroll for the next two weeks, but that I did not have to perform any of my job duties during that time.

9.     March 26, 2008, was my last day on the Cambria payroll. I was not offered and did not receive an exit interview even though it was company policy for departing employees to receive an exit interview.

10.     I signed my employment contract with Surface Solutions on about March 18, 2008, and went on the company payroll on March 31, but my first day working out of the Surface Solutions' office was Monday, April 7, 2008. Surface Solutions had been a Cambria Installer Associate ("CIA") and business partner of Cambria's since about March 19, 2007. Because Cambria does not sell directly to consumers, Cambria has established formal relationships with fabricators, designers and/or installers around the world (with about six CIAs in the Chicago area). These business partners are the only companies with the authority sell Cambria products to other dealers and to consumers. In order to become a CIA business partner, the fabricator/installer/dealer companies must participate in lengthy training programs conducted by Cambria to learn how best to promote and sell the products.

11.     When I arrived at Surface Solutions on April 7, I understood, after a conversation with Mr. Linze, that Mr. Linze had been visited by Mr. Simonett the previous Friday, April 4, that Mr. Simonett had terminated the CIA business partnership with Cambria, that Surface Solutions could no longer offer or sell Cambria products and that the partnership was terminated because of Surface Solutions' low productivity. This was done in spite of the fact that Surface Solutions had secured about six new Cambria orders in the previous week and that other business partners in the Chicago area had even lower productivity but remained affiliated with Cambria.

3

This caused me to believe that Cambria was only terminating the partnership because I had started working for Surface Solutions, notwithstanding the fact that I was hired expressly to promote and sell only Cambria products.

12.     Mr. Linze asked me about my non-competition agreement with Cambria and I understood from this question that Mr. Simonett had raised my non-compete agreement in the April 4 meeting. I told Mr. Linze that I had a non-compete agreement with Cambria but that I had not discussed it with him because he hired me to promote and sell only Cambria products. I did not and do not agree that I violated my Cambria non-compete agreement by working for Surface Solutions.

13.     The purpose of my employment with Surface Solutions is to promote and sell Cambria products, thus acting in the best interests of Cambria and acting in compliance with the non-compete agreement.

14.     Furthermore, I never received or learned of any Cambria confidential information. Cambria keeps no confidential client lists — at least none of which I am aware — because it publishes on its Web site the names and addresses of its business partners and retail dealers, and it does not deal directly with the end consumers.

FURTHER AFFIANT SAYETH NOT.

Affiant,

*Pam VanDeursen*

Pam VanDeursen

State of Illinois       )
                        ) ss.
County of Cook          )

Sworn to, affirmed and subscribed before me by the above affiant this ___24___ day of April, 2008.

_____
Notary Public

[seal]

ADAM W LASKER
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
September 05, 2010

4

Rev. 47.143

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

PAM VanDEURSEN,                                )
                                               )
        Plaintiff,                             )
                                               )
vs.                                            )       No. _____
                                               )
CAMBRIA ENTERPRISES INC., a Minnesota          )
Corporation, and CAMBRIA FABSHOP -             )
CHICAGO INC., a Minnesota corporation,         )
                                               )
        Defendants.                            )

## AFFIDAVIT

I, Gary Lanze, being first duly sworn, do hereby state under oath that the following
statements are true and correct based on my personal knowledge, information and belief, and that
if called upon to testify, I would so state under oath:

1.      I am the president of Surface Solutions Inc., an Illinois corporation located at
1500 Foundry Park, Suite 1, in St. Charles, Illinois. Surface Solutions is a fabricator, designer
and installer of countertop surfaces for residential and commercial use.

2.      On or about March 19, 2007, Surface Solutions became official business partners
with Cambria Enterprises Inc., a Minnesota corporation, and/or Cambria FabShop - Chicago,
Inc., a Minnesota corporation that is authorized to conduct business in the State of Illinois
(hereafter collectively referred to as "Cambria"). This partnership as a "Cambria Installer
Associate" ("CIA") meant that Surface Solutions was given the authority to sell Cambria's
unique quartz products to our clients. In order to obtain this partnership, my business partner
Troy Elliotts and I had to attend meetings and training sessions at Cambria's Minnesota offices.

3.      We had entered into an agreement with Cambria in order to become business
partners. We do not have a copy of this written agreement because it was taken back by Cambria
District Manager Patrick Simonett on April 4, 2008, when this agreement was terminated by
Cambria as will be discussed below. (See Exhibit 1, wherein Cambria refers to Surface Solutions
as a business partner).

4.      Surface Solutions first became acquainted with Cambria in early 2006, when we
received a phone call from a woman named Pam VanDeursen, who identified herself as a

Exhibit C

1

Cambria marketing representative. She said she was calling to see if Surface Solutions was interested in becoming a Cambria business partner. We engaged in conversations with Cambria employees, including Ms. VanDeursen, for about six months before we started our official training to become a Cambria Installer Associate.

5.    From the time we became business partners until the time Ms. VanDeursen left her employment with Cambria, we were in regular contact with Ms. VanDeursen about the promotion of Cambria products to dealers.

6.    As a Cambria business partner, we were permitted to offer this high-end product as an option for the designers, installers and consumers with whom we do business. We continue offering other brands of countertop surfaces, but we regard the Cambria product to be our highest-quality option. Cambria promotes itself as the only manufacturer of natural-quartz countertops in the U.S., which gives Surface Solutions the ability to promote and sell a unique product that can only be obtained from a small number of sources. In early 2008, I received a routine notice from Cambria that only five other CIAs operate in the entire Chicagoland area.

7.    Surface Solutions made approximately 25 to 30 sales of Cambria products, totaling about $82,000 in sales, during the nine-or-so months of partnership in the year 2007. In the first three-and-a-half months of 2008, Surface Solutions made approximately seven to ten Cambria sales totaling about $33,000.

8.    About February 29, 2008, I received another phone call from Ms. VanDeursen, informing me that she was going to be leaving her job as a marketing representative for Cambria. She discussed with me that Cambria executives were interested in increasing Surface Solutions' productivity in selling the Cambria products. She then asked me whether my company would have any interest in hiring her as a Cambria sales representative. My partners and I determined that this would make a positive impact for our Cambria sales. In fact, there were several clients who said they were not happy with their current Cambria dealer and we had convinced them to stick with the Cambria products by working through Surface Solutions. For these and other reasons, my partners and I determined that hiring Ms. VanDeursen could be a very successful endeavor for our company (in addition to whatever advantages the increased sales would bring to Cambria), and we eventually made a written job offer to Ms. VanDeursen, which she accepted.

9.    On March 12, 2008, I had a conversation with Cambria executive Patrick Simonelli. I told Mr. Simonelli I was aware that Ms. VanDeursen was going to be leaving Cambria and that were hoping to hire her as our new Cambria sales representative. I told him that

2

Ms. VanDeursen would continue to promote Cambria sales for Surface Solutions and that we expected this to result in a healthy growth in sales of Cambria products. He expressed nothing negative about us hiring Ms. VanDeursen and he gave the impression that we would continue to grow our relationship as business partners.

10.    On March 18, 2008, I attended a meeting at the Cambria FabShop - Chicago fabrication facility in Waukegan, Illinois. Mr. Simonett also attended that meeting and we again discussed the fact that I was hoping to hire Ms. VanDeursen as a Cambria sales rep. His response again was quite positive. He also said he would come to Surface Solutions the following week to inform me as to who would be taking over Ms. VanDeursen's former role as the Cambria marketing executive for my region.

11.    About two weeks later, Mr. Simonett came to Surface Solutions' offices on Friday, April 4, 2008. I was expecting the purpose of this visit to be a discussion about the new Cambria marketing rep covering my region. However, one of the first things Mr. Simonett asked me was whether I hired Ms. VanDeursen. She had been hired and I let Mr. Simonett know this. Immediately following my response, and much to my surprise and disappointment, Mr. Simonett then told me that Cambria was terminating their partnership with us.

12.    Mr. Simonett stated that Surface Solutions had not been making adequate sales to continue the partnership. I told him that we had just secured six new sales within the previous week, and that our total Cambria sales for this first portion of 2008 totaled about $33,000, but this did not convince Mr. Simonett to continue the partnership. He told me that Cambria would still fulfill the orders for the six new sales, but that I would have to pre-pay Cambria for all the materials supplied for those six projects. This differed substantially from our business partner terms, where we were given 30 days following delivery of the product to make payments.

13.    Sue Gliszinski of Cambria then said in a letter that I, on behalf of Surface Solutions, had solicited Ms. VanDeursen to leave her employment with Cambria and to come work for us. This is completely false, as I had never even considered hiring Ms. VanDeursen until she called me on about February 29, 2008.

14.    Ms. Gliszinski also stated in the letter that Ms. VanDeursen was bound by a covenant not to compete with Cambria for two years after termination of her employment. Mr. Simonett also stated that it was a violation of that agreement for Ms. VanDeursen to work for Surface Solutions, which made no sense to me because Surface Solutions is (or was until April 4) a business partner with Cambria and Ms. VanDeursen was hired for the purpose of promoting

3

and selling Cambria products. With the addition of Ms. VanDeursen to our staff, Surface Solutions now had a full sales team dedicated to Cambria products and we were continuing to participate fully as Cambria's business partner in promoting their product.

15.    The termination of the business partnership just over a year after it began is a severe loss to my company in regards to the amount of time and energy we put into in attending the Cambria training sessions and in promoting their product line with our customers, and in the amount of money we spent on product samples for a product we are no longer authorized to sell. In the days since the termination of this partnership, I have been forced to turn away customers who want to purchase Cambria products and I have been forced to explain to my customers and competitors that my business is still sound, despite having been mysteriously dropped from the list of Cambria business partners. I believe the termination of this partnership reflects poorly on my company's public image and was and is very harmful to us. I also believe there to be no valid, equitable, or justified reasons for this termination. Surface Solutions worked hard to generate approximately $115,000 in Cambria sales during our first 12 months as business partners, and we were just beginning to reap the benefits of our promotional work for Cambria products. Moreover, we anticipated even more Cambria product sales with Ms. VanDeursen on board as our sales representative, and we strongly expressed this to Mr. Simonett during every meeting we had with him.

16.    I have been informed and believe that several of the other five Cambria business partners in Illinois did not do much better than this sales amount during their first year or so, and that one current Cambria business partner of several years standing does even less than this.

**FURTHER AFFIANT SAYETH NOT.**

Affiant,

_____
Gary Linze

State of Illinois    )
                     ) ss.
County of Cook       )

Sworn to, affirmed and subscribed before me by the above affiant this 21 day of April, 2008.

_____                    (seal)
Notary Public

OFFICIAL SEAL
Patricia Jensen
Notary Public, State of Illinois
My Commission Expires 03-05-2009

4

# EXHIBIT B

Rev. 4/24/08

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

PAM VanDEURSEN,          )

     Plaintiff,          )      **08 CH 15281**

     vs.          )   No._____

CAMBRIA ENTERPRISES INC., a Minnesota  )
Corporation, and CAMBRIA FABSHOP -   )
CHICAGO INC., a Minnesota corporation,  )

     Defendants.         )

## MOTION FOR AN EXPEDITED HEARING FOR A PRELIMINARY INJUNCTION

NOW COMES plaintiff Pam VanDeursen, by and through her attorneys from Lavelle

Law Group LLC, moving for the entry of a preliminary injunction enjoining defendants Cambria

Enterprises Inc. ("Cambria") and Cambria FabShop-Chicago Inc. preliminarily from interfering

in any way with plaintiff's employment with Surface Solutions Inc. ("Surface") and restoring to

Surface the right to sell Cambria products under the terms of the business partnership agreement

Surface had with defendants so that plaintiff can do the job that Surface hired her to do.

          PAM VanDEURSEN
          Plaintiff

          By: _____
              One of her attorneys

Lavelle Law Group LLC          Of Counsel:
Michael E. Lavelle, #55311       Kevin E. Bry, #18587
Adam W. Lasker, #43334        218 N. Jefferson St., Suite 203
218 N. Jefferson St., Suite 203    Chicago, IL 60661
Chicago, IL 60661          (312) 749-7400
(312) 559-0600

**EXHIBIT B**

Rev. 4/24/08

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

PAM VanDEURSEN,                            )
                                           )
          Plaintiff,                       )
                                           )
          vs.                              )        No. 08 CH 15281
                                           )
CAMBRIA ENTERPRISES INC., a Minnesota      )
Corporation, and CAMBRIA FABSHOP -         )
CHICAGO INC., a Minnesota corporation,     )
                                           )
          Defendants.                      )

## EMERGENCY
## NOTICE OF MOTION

   **PLEASE TAKE NOTICE** that on Tuesday, April 29, 2008, at 10:30 a.m. or as soon
thereafter as counsel may be heard, I shall appear before the Honorable Judge Mason, or any
judge sitting in his or her stead, in Courtroom 2510 of the Richard J. Daley Center, 50 W.
Washington St., Chicago, Illinois, and shall then and there present Plaintiff's Motion for an
Expedited Hearing for a Preliminary Injunction, a true and accurate copy of which is herewith
served upon you.

                                   By: _____
                                        One of plaintiffs' attorneys

## PROOF OF SERVICE

   I, the undersigned attorney, do hereby certify that on April 24, 2008, I caused to be
served the above Notice of Motion, along with a copy of Plaintiff's Motion for an Expedited
Hearing for a Preliminary Injunction, a Memorandum in Support, a Motion for a Preliminary
Injunction, and this Notice by sending same via U.S. Mail and either facsimile or email, Chicago,
Illinois, postage paid and properly addressed to the address indicated (and emailed or faxed to
the email address or fax number listed) to the individuals and/or entities listed on the attached
Service List.

                                   By: _____
                                        One of plaintiffs' attorneys

Lavelle Law Group LLC                      Of Counsel:
Michael E. Lavelle, #55311                 Kevin E. Bry, #18587
Adam W. Lasker, #43334                     218 N. Jefferson St., Suite 203
218 N. Jefferson St., Suite 203            Chicago, IL 60661
Chicago, IL 60661                          (312) 749-7400
(312) 559-0600

## SERVICE LIST

*Pam VanDeursen v. Cambria Enterprises Inc., et al.* 08 CH 15281

**Cambria Enterprises, Inc.** — (No registered agent on file for Illinois or Minnesota)
ATTN: Legal Department
704 N. Main St.
Le Sueur, MN 56058
Facsimile 507-665-3701

**Cambria FabShop-Chicago, Inc.**
ATTN: Legal Department
704 N. Main St.
Le Sueur, MN 56058
Facsimile 847-244-9804

**CT Corporation System**
Illinois Registered Agent for Cambria FabShop-Chicago, Inc.
ATTN: Cambria FabShop-Chicago, Inc. Legal Department
208 S. LaSalle St., Suite 814
Chicago, IL 60604
Facsimile 312-345-4343

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PAM VANDEURSEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CAMBRIA ENTERPRISES, INC., a Minnesota | ) | (Removed from Circuit Court of Cook |
| corporation, CAMBRIA FABSHOP- | ) | County, Illinois, Case No. 08 CH 15281) |
| CHICAGO, INC., a Minnesota corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF JAMES TUCKER

James Tucker, being duly sworn, deposes and states as follows:

1.      I am the Assistant Chief Financial Officer of Cambria Enterprises, Inc. and Cambria Company (collectively "Cambria"). I make this affidavit on my personal knowledge.

2.      CAMBRIA® brand natural quartz products sell at retail for slightly above $50 per square foot on a national average basis. In the Chicago area, the per square foot price is slightly higher than the national average.

3.      A typical residential kitchen or bathroom construction or remodeling project, where new surfaces are being installed, involves approximately 80 square feet of product surface, e.g., for countertops, back splash, etc.

4.      If Pam VanDeursen deflected the sale of 1500 square feet of surface product from CAMBRIA® to other competing brands in the Chicago area — or approximately 19 typical bathroom or kitchen projects — the lost revenue to Cambria would exceed $75,000.

2170159v1

**EXHIBIT C**

5.     Over a two year period, a retail sales associate would be expected to sell many times more than 19 residential kitchen or bath projects, in addition to commercial projects, which typically are much larger in scale than residential projects.

6.     The amount in controversy in this action is far in excess of $75,000 from the viewpoint of Cambria.

_____
James Tucker

Subscribed and sworn to before me
this 28th day of April , 2008.

_____
Notary Public

JULIA H. SAATZER
Notary Public-Minnesota
My Commission Expires Jan 31, 2010

2170159v1